Rodney CHAMBERS, Executor of the Estate of Mac Childs, Deceased *v.* Venita MANNING, et ux.

93-491                                    868 S.W.2d 64

Supreme Court of Arkansas
Opinion delivered December 20, 1993

*Will Stocks*, for appellant.

*Claudell Woods*, for appellees.

DAVID NEWBERN, Justice. Rodney Chambers, executor of the estate of Mac Childs appeals from a Chancellor's ruling involving a real estate contract between Mr. Childs and Venita Manning and her husband James Manning. Mr. Chambers claims the Chancellor erred by imposing a 6% interest rate, pursuant to Article 19, § 13, of the Arkansas Constitution, on a contract that contained a readily ascertainable interest rate. Mr. Chambers also claims the Chancellor erred by reforming the agreement, which he contends was a lease-purchase contract, into a sale and mortgage and by incorrectly imposing post-judgment interest pursuant to Ark. Code Ann. § 16-65-114(a) (1987). With respect to Mr. Childs' first two arguments, we find no error; however, we remand this case for a proper determination of post-judgment interest.

In late 1987, James and Venita Manning approached Mac Childs about purchasing a home Mr. Childs owned in Magnolia. Mr. Childs told the Mannings he was willing to sell for $20,000. The Mannings explained they could only afford to pay $160 per month.

After some discussion, Mr. Childs prepared a "memo" for the Mannings dated November 14, 1987. The memo stated Mr. Childs would sell the house for $20,000, with a $1,000 down payment. The $19,000 balance would be paid at a rate of $160 per month for twenty-four months. The monthly payments would then increase to approximately $225 per month until the balance was paid in full. The memo stated the interest rate charged would be the interest rate a bank charged Mr. Childs to finance the outstanding balance. Mr. Childs added that he currently had a commitment of 10.25% for one year. The memo further stated the Mannings would be responsible for insurance and taxes, and the agreement was a "rental-purchase" agreement.

On December 12, 1987, the Mannings presented Mr. Childs with the $1,000 down payment. Mr. Childs prepared a handwritten document that essentially restated his November memo. This document stated that payments of $160 per month would begin on February 1, 1988, and would increase to $200 per month in two years. It additionally stated "interest rate is to be the amount seller has to pay bank for financing." This document was signed by Mac Childs but not by Mr. or Ms. Manning.

The Mannings moved into the home and made their first $160 payment on February 5, 1988. Their next payment, on March 24, 1988, was for $40. For the next two years, the Mannings' payments were sporadic.

The Mannings subsequently asked Mr. Childs about purchasing a vacant lot adjacent to the home. Mr. Childs stated that he would sell the lot for $3,000 which would be added to the balance of the Mannings' debt.

Both parties grew frustrated with their agreement. The Mannings, believing they were purchasing the home, made frequent requests for a deed. Mr. Childs grew impatient with the Mannings' arrears in payments.

In 1990 the Mannings divorced. Ms. Manning requested that Mr. Childs remove Mr. Manning from the agreement. Mr. Childs agreed to re-negotiate the sale of the home with Ms. Manning. In a letter, he stated the new purchase price would be the balance currently owed from the original agreement. Mr. Childs calculated it to be approximately $26,000. Additionally, he stated the new interest rate would be 11%.

In October, 1991, the Mannings sued to enforce the original agreement which, including the sale of the lot next to that on which the house was located, totalled $22,000, plus interest. The complaint stated the Mannings intended to learn the actual interest rate charged through discovery, but should that be impossible, 6% should be imposed by the Chancellor.

Mr. Childs answered and filed a counterclaim seeking a vendor's lien foreclosure for the balance of $27,546.98; or, in the alternative, enforcement of the rental agreement and payment of unpaid rent in the amount of $4,177.40. The counterclaim stat-

ed the figures were based on an interest rate of 10.5%, accruing from December of 1987.

At trial both parties stated they were still willing to perform the agreement. Mr. Childs testified he had mortgaged the home with an interest rate of 10.5% from December, 1987, until March, 1991. At that time he refinanced the house for 9.5%. Mr. Childs presented a payment history from the first mortgage which corroborated that portion of his testimony. Mr. Childs also presented a statement prepared by an accountant, but based on information given by Mr. Childs to the accountant, to show the payment schedule for the home based on these interest rates. No other evidence was presented to verify the 9.5% mortgage in 1991.

Mr. Childs testified that some time after the original agreement, he agreed to sell the adjacent vacant lot to the Mannings for $3,000. He also testified it was understood the $3,000 would be "added back" to the Mannings' unpaid balance from the original contract date.

The Mannings testified they never knew the actual interest rate they were being charged. They agreed that they purchased the vacant lot for $3,000, but neither could remember exactly when this took place. Neither of the Mannings remembered being told the price of the lot would be "added back" to their unpaid balance. No written agreement for the sale of the lot was introduced by either side.

The Chancellor issued a letter opinion on September 11, 1992. He stated that an agreement existed between the parties to purchase the home for $20,000, with $1,000 down and Mr. Childs to finance the balance. The opinion stated the remainder of the agreement was unclear.

The Chancellor found that no written contract was signed by the parties. He concluded, however, that the statute of frauds did not apply because it was not affirmatively pleaded by either party and the partial performance of the parties allowed enforcement of the agreement.

Additionally the opinion stated that an interest rate could not be determined for the agreement. The Chancellor, therefore, imposed a 6% interest rate pursuant to Ark. Const. art. 19, §13(d)(i).

Using that rate, the Chancellor determined the Mannings owed Mr. Childs $19,881.46. This balance included taxes and insurance paid by Mr. Childs, and $3,000 for the vacant lot. The price of the lot was added to the balance as of January 1, 1989, rather than "added back" to the original date of the agreement.

The Chancellor's ruling allowed the parties 60 days to execute a promissory note secured by a mortgage on the house. The note would be for $19,881.46 at a prevailing interest rate.

In the alternative, the Chancellor stated the Mannings could pay the balance within 60 days, accruing interest at a rate of 6% from the date of his ruling.

### 1. Final order

A Chancellor's order must be final to be appealable. Ark. R. App. P. 2(a)(1). The requirement is jurisdictional. Even if the parties to an appeal do not address this issue, it is our duty to determine whether our jurisdiction is proper. *Alberty* v. *Wideman*, 312 Ark. 434, 850 S.W.2d 314 (1993); *Mueller* v. *Killam*, 295 Ark. 270, 748 S.W.2d 141 (1988). Neither party has raised the issue, but it was discussed in oral argument and we choose to discuss it here.

After the Chancellor determined the balance the Mannings owed Mr. Childs, his ruling provided for alternative resolutions, recognizing that both parties were willing to consummate the transaction. Either resolution was to take place within 60 days from the Chancellor's ruling. Mr. Childs, who has since died and been replaced as a party to the appeal by his executor, appealed the ruling before the expiration of the 60-day period. The record does not indicate whether either party attempted to comply with the parts of the Chancellor's ruling which went beyond the determination of the debt due.

The final order question was analyzed at length in *Thomas* v. *McElroy*, 243 Ark. 465, 420 S.W.2d 530 (1967). While the *Thomas* case was decided based on prior Arkansas statutory law, we have relied on its authority in several cases since promulgating Ark. R. App. P. 2 which now governs the issue of finality. *See Pledger* v. *Bosnick*, 306 Ark. 45, 811 S.W.2d 286 (1991)(Newbern, J., dissenting); *Estate of Hastings* v. *Planters*

*and Stockmen Bank*, 296 Ark. 409, 757 S.W.2d 546 (1988); *Mueller* v. *Killam, supra.* In the *Thomas* case we stated that a final judgment is one that "finally adjudicates the rights of the parties, putting it beyond the power of the court which made it to place the parties in their original positions [citation omitted]. It must be such a final determination as may be enforced by execution or in some other appropriate manner [citation omitted]."

Applying this analysis to this case, we hold the Chancellor's ruling is final for purposes of appeal. Unlike the *Mueller* case, the ruling of the Trial Court now before us addressed every issue presented by the parties, reserving no issues for latter determination. Unlike the *Estate of Hastings* case, this ruling also determined the specific dollar amount the Mannings owed Mr. Childs. Unlike *Kelly* v. *Kelly*, 310 Ark. 244, 835 S.W.2d 869 (1992), cited in the dissenting opinion, the Trial Court's order in this case did not refer to the possibility of any further hearing or judicial intervention subsequent to the judgment.

Although the parties were given a 60-day period to work out their apparent desire to have a sale and purchase of the property in question, we have no doubt that, in the absence of the taking of the prescribed steps to that end, the decree would have been enforceable by execution for the amount determined to be owed by the Mannings to Mr. Childs. The ruling was thus final in accordance with Ark. R. App. P. 2(a).

## 2. Article 19, § 13, and reformation

The Chancellor determined that Mac Childs entered an agreement to sell a home to the Mannings. However the Chancellor further determined that the interest rate the parties agreed to was "vague and unclear." For this reason the Chancellor applied Ark. Const. art. 19, § 13(d)(i), which imposes a six percent interest rate on contracts in which no interest rate has been established. Mr. Chambers contends the interest rate the parties agreed to was readily ascertainable from the contract and the Chancellor erred in imposing the six percent rate.

Mr. Childs presented the Mannings with two documents concerning this transaction. Each stated the interest rate would be the amount a bank charged Mr. Childs to finance a loan to him on the home. The first document stated Mr. Childs believed

that rate was 10.25%. Mr. Childs' answer to the Mannings' complaint stated that it was "11% or higher." His counterclaim stated the rate was 10.5%.

At trial, Mr. Childs presented a bank statement that showed he had mortgaged the home from December, 1987, until March, 1991 at a rate of 10.5%. Mr. Childs testified that he then refinanced the home for an interest rate of 9.5%. The only evidence Mr. Childs presented to support his testimony was an amortization schedule prepared by Mr. Childs' accountant. That schedule showed what the Mannings' payments and balance should have been applying the 10.5% and 9.5% interest rates.

A Chancellor's findings of fact are reviewed *de novo*, and will not be set aside unless they are clearly erroneous. Ark. R. Civ. P. 52(a); *Guaranty Nat'l Ins.* v. *Denver Roller, Inc.*, 313 Ark. 128, 854 S.W.2d 312 (1993). Mr. Childs' presentation to the Chancellor left much confusion as to what the actual interest rate was. It is, however, also clear that the parties agreed how the interest rate was to be calculated.

While Mr. Childs appears to have presented strong evidence that his original mortgage was 10.5%, the Chancellor was not obligated to accept Mr. Childs' testimony with respect to his 9.5% mortgage. As the Chancellor could not calculate the interest rate charged throughout the entire agreement, we cannot say it was clearly erroneous to find that no interest rate had been established.

We affirm the Chancellor's decision to reform the parties' agreement and to impose a 6% interest rate pursuant to Article 19, § 13(d)(i). While the decree might be called a "reformation," its effect did no more than establish the debt owed and give the parties themselves a chance to "re-form" their agreement. A Chancellor has broad power in fashioning a remedy, limited only to the extent that it be reasonable and justified by the proof. *Smith* v. *Eastgate Properties, Inc.*, 312 Ark. 355, 849 S.W.2d 504 (1993). Under these circumstances, the Chancellor's ruling fashioning this agreement as a sale, and not a lease-purchase agreement was very reasonable. As the correct interest rate could not necessarily be calculated, the Chancellor's decision to impose the Constitutional rate was justified.

### 3. Post-judgment interest

Mr. Childs finally contends the Chancellor erred with respect to post-judgment interest. The Chancellor's ruling provided:

> Within sixty (60) days of this date plaintiffs shall execute and deliver to defendant their Promissory Note, secured by a mortgage on the property at an interest rate and for a term consistent with the prevailing rate and terms offered . . . .

> In lieu of the above, plaintiffs may, within sixty (60) days from this date, pay the balance owed the defendant plus interest accrued from September 10, 1992 at the rate of 6% per annum.

The ruling also provided that, should the plaintiffs execute a promissory note, it would be in the amount of the balance owed to Mr. Childs.

Either of these alternatives had to be in effect within 60 days. However, only the latter provided for interest to accrue during this period. Post-judgment interest is governed by Ark. Code Ann. § 16-65-114(a) (1987), which states:

> Interest on any judgment entered by any court or magistrate on any contract shall bear interest at the rate provided by the contract or ten percent (10%) per annum, whichever is greater, and on any other judgment ten percent (10%) per annum, but not more than the maximum rate permitted by the Arkansas Constitution . . . .

It was error for the Chancellor not to impose post-judgment interest on each alternative. Otherwise, the appellees would be permitted to execute a promissory note and mortgage on a debt that has accrued no interest since the Chancellor's ruling.

With respect to the alternative that has been accruing post-judgment interest, it was error for the Chancellor to simply impose the rate of 6%. Arkansas Code Ann. § 16-65-114(a) (1987) clearly provides for imposing the greater of the contract rate, ten percent, or the maximum rate allowed by the Arkansas Constitution. As we cannot determine whether ten percent would

have been a legal (non-usurious) rate in September, 1992, we must remand this case to the Chancellor for entry of an order that imposes post-judgment interest in accordance with § 16-65-114.

Affirmed in Part and Reversed in Part and Remanded.

GLAZE and BROWN, JJ., dissent.

ROBERT L. BROWN, Justice, dissenting. This court has been assiduous in holding that we will only review final orders under Ark. R. App. P. 2(a). *See, e.g., Kelly* v. *Kelly*, 310 Ark. 244, 835 S.W.2d 869 (1992); *Jackson* v. *Yowell*, 307 Ark. 222, 818 S.W.2d 950 (1991). We have underscored consistently that unlike some of our sister states we will entertain only one appeal from a matter after it is finally decided.

Here, the matter is not final. The chancellor's order provides:

IT IS THEREFORE ORDERED, that;

1) Within sixty (60) days, the plaintiffs execute and deliver to the defendant their Promissory Note, secured by a mortgage on the property at an interest rate and for a term consistent with the prevailing rate and terms offered by lending institutions in Columbia County; or, alternatively,

2) Within sixty (60) days, the plaintiffs have the option of paying the balance owed plus interest accrued from September 10, 1992 at 6% per annum to the defendant.

The order clearly leaves several questions unanswered, assuming the chancellor's order was affirmed:

1. How much of the sixty days remains for choosing Alternative 1 or Alternative 2?

2. Has the sixty days expired?

3. Is the amount of the promissory note under Alternative 1 to be the balance owed as of September 10, 1992, or is it to include accrued interest from that date?

4. When does the interest in the promissory note begin to run under Alternative 1?

5. What judgment amount will any post-judgment interest apply against?

6. What non-usurious post-judgment interest rate will apply under either alternative?

There has been no Rule 54(b) certification in this case. And based on the above it is more than likely that additional matters will be resolved by the chancellor after this decision which could result in a subsequent appeal. Indeed, the judgment amount is not even known at this juncture.

Factually, this case is akin to *Kelly* v. *Kelly, supra.* In *Kelly*, an appeal was taken from an intermediate order directing a party to execute a quitclaim deed. Still pending before the chancellor at the time the notice of appeal was filed was a motion to set aside the order. We said there:

> For a judgment to be final, it must dismiss the parties from the court, discharge them from the action, or conclude their rights to the subject matter in controversy. (Citations omitted.) To be final, an order must be of such a nature as to not only decide the rights of the parties, but to put the court's directive into execution, ending the litigation or a separable part of it.

310 Ark. at 245, 835 S.W.2d at 871. Surely, the order appealed from in the instant case does not "put the court's directive into execution ending the litigation."

The majority opinion seeks to distinguish the *Kelly* decision from the case at hand by stating that the chancellor's order did not specifically "refer to the possibility of any further hearing or judicial intervention subsequent to the judgment." Nevertheless, that order, as quoted above, most definitely contemplates further action by the court once an election of alternatives is made by the Mannings. The issues of the judgment amount and any assessment of post-judgment interest are the most glaring examples of matters left to be decided. The majority virtually admits this by remanding the case to the chancellor for imposition of non-usurious post-judgment interest under either alter-

native. Thus, a further hearing is contemplated. What is the practical distinction between this case and *Kelly*?

With this case now as precedent, it will be difficult to gauge the "finality" of court orders. This is an area where the standard needs to be crystal clear and consistently applied. For that reason, I respectfully dissent.

GLAZE, J., joins.