BANK of AMERICA, N.A. *v.*
C.D. SMITH MOTOR COMPANY, INC.

02-632 106 S.W.3d 425

Supreme Court of Arkansas
Opinion delivered May 22, 2003

230

*Rose Law Firm,* by: *Amy Lee Stewart, Kathryn Bennett Perkins,* and *John D. Coulter,* for appellant/cross-appellee.

*Gibson Law Office,* by: *Charles Sidney Gibson,* for appellee/cross-appellant.

TOM GLAZE, Justice. This is a contract case which, among other things, involves the interpretation of our Uniform Commercial Code, particularly Ark. Code Ann. §§ 4-1-205 and 4-2-202 (Repl. 2001), the Code's course-of-dealing provisions. We also take jurisdiction of this appeal because it requires the court's interpretation of Ark. Code Ann. § 16-64-130 (Supp. 2001), as to when punitive damages can be awarded in a contract case involving a financial institution.

Appellee C.D. Smith Motor Co., Inc. (C.D. Smith),[1] was a used-car dealer in Pine Bluff, and had established a recourse-

---

[1] Hereafter, C.D. Smith is used interchangeably to refer to C.D. Smith, the company, and to C.D. Smith, the individual.

financing relationship over the years with Bank of America, N. A., and its predecessor banks.[2] In the years 1996-1997, C.D. Smith sold approximately seventy percent of its cars through recourse financing, whereby it would guarantee the car purchaser's financing. About thirty to thirty-five percent of C.D. Smith's recourse financing was done through Bank of America.[3] C.D. Smith sold a small percentage of its cars through non-recourse financing when a purchaser's credit was sufficient and C.D. Smith was not required to sign the note.

On November 12, 1996, C.D. Smith and the Bank signed a Recourse Chattel Paper and Security Agreement, which included a $2.3 million recourse-financing limit, which reduced an earlier limit set at $4 million. Over the years, C.D. Smith and the Bank had developed various procedures by which they carried out these recourse-financing agreements. Under one such practice, the Bank would attempt to collect on accounts that were less than sixty days delinquent, and it provided a list of those accounts to C.D. Smith, so that C.D. Smith could assist in the efforts to collect the delinquencies. The Bank also notified C.D. Smith of any bankruptcy filings by delinquent loan-account holders, so that C.D. Smith could file a claim with the bankruptcy court.

After having signed the November 12, 1996, one-year agreement, the Bank sent a letter on February 13, 1997, advising C.D. Smith that, effective April 1, 1997, it would no longer offer recourse financing. The Bank also notified C.D. Smith that it would cease the practice of providing weekly delinquency lists, as had been done in the past. By letter dated March 7, 1997, the Bank informed C.D. Smith that the collection operations of the Bank were being moved to St. Louis, and the delinquency list accompanying the Bank's letter would be the last.

After the Bank discontinued recourse financing to C.D. Smith, C.D. Smith sized down its business and made some unsuccessful

---

[2] C.D. Smith first dealt with National Bank of Commerce, which was purchased by Worthen Bank, which merged with Boatmen's, which became Nations Bank, and later was taken over by Bank of America. For writing purposes, we refer throughout the opinion to the Bank or Bank of America.

[3] C.D. Smith also had a $1.2 million recourse financing limit with another local bank, and additionally financed about twenty-one percent of its vehicle sales in-house.

efforts to obtain recourse financing with other banks. C.D. Smith's business failed and closed in September 1997. On October 22, 1997, C.D. Smith filed suit against the Bank, asserting the Bank had breached the parties' November 12, 1996, agreement. The Bank answered, admitting liability for breach of contract, but it denied having caused any damages arising from its breach. Prior to trial, on December 3, 2001, the Bank filed a motion in limine requesting the trial court to exclude all evidence pertaining to any alleged custom and usage or course of dealing between C.D. Smith and the Bank. At a hearing on December 5, 2001, the trial court ruled that the course-of-dealing evidence was relevant to determine C.D. Smith's damages and denied the Bank's pretrial motion.

The parties tried their case on December 5, 6, 7, and 8, 2001, and the jury found in C. D. Smith's favor, awarding it $1,066,000 in damages. The court fixed post-judgment interest at 6.25%, denying C.D. Smith's request that 10% interest be imposed. The trial court had earlier denied C.D. Smith's request that it be awarded punitive damages. The court concluded the matter by awarding C.D. Smith attorneys' fees in the amount of $252,605.29.

The Bank filed two postjudgment motions requesting relief from the jury award, but the court denied them. The Bank then filed a timely direct appeal raising three principal points for reversal:

> (1) The trial court erred in allowing C.D. Smith to intro- duce parol evidence pertaining to the parties' course of dealing when considering their November 12, 1996, agreement.
>
> (2) C.D. Smith failed to show the "tacit agreement" required for an award of consequential damages.
>
> (3) C.D. Smith failed to show any damages were caused by the Bank's breach.

C.D. Smith filed a cross-appeal, contending the trial court erred (1) in ruling the Bank was not subject to punitive damages, and (2) in fixing postjudgment interest at 6.25% instead of 10%.

The Bank's initial argument submits several reasons why the trial court should have excluded evidence of the parties' prior course of dealings. First, the Bank contends course-of-dealing evidence was inadmissible because the parties' written agreement

included an explicit merger provision. That merger clause provided as follows:

> This Agreement contains all the terms of the Chattel Paper purchase agreement between the parties, and no other statement or agreement shall have any force or effect. Borrower [Smith] agrees that he is not relying on any representation or agreement regarding the purchase of Chattel Paper except those contained in this Agreement.

In support of its argument that the course-of-dealing evidence should not have been admitted, the Bank cites a court of appeals case, *Hagans v. Haines*, 64 Ark. App. 158, 984 S.W.2d 41 (1998), wherein that court reversed a trial court's decision to permit parol evidence regarding an oral rental agreement, even though the parties' written rental agreement contained a merger clause. That clause provided that the written agreement contained the entire understanding and agreement between the parties, and the written agreement superceded all prior or contemporaneous agreements, representations, and understanding, and no oral representation or statement shall be considered a part of the written agreement.

■ Despite the Bank's reliance on *Hagans*, that case offers little help in the instant case because that decision did not involve the Uniform Commercial Code. Here, C.D. Smith and the Bank executed the November 12, 1996, agreement captioned "Recourse Chattel Paper and *Security* Agreement," whereby the Bank retained security interests governed by the Code. Under the Code, a writing intended to be the parties' final expression of their agreement may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement, but *"may be explained or supplemented by course of dealing."* See § 4-2-202(a) (emphasis added). Ark. Code Ann. § 4-1-205 (Repl. 2001), in relevant part, defines course of dealing as follows:

> (1) *A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.*

* * *

(3) *A course of dealing between parties . . . give[s] particular meaning to and supplement[s] or qualif[ies] terms of an agreement.*

(4) The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable, express terms control both course of dealing and usage of trade[.]

(Emphasis added.)

■ Citing *Precision Steel Warehouse, Inc. v. Anderson-Martin Machine Co.*, 313 Ark. 258, 854 S.W.2d 321 (1993), the Bank urges that, as long as the parties' November 12, 1996, agreement was unambiguous, any evidence related to course of dealing is irrelevant and, therefore, inadmissible. The Bank further submits that the rule precluding course-of-dealing evidence to interpret an unambiguous contract is one aspect of the parol-evidence rule, which provides that "a written contract merges, and thereby extinguishes, all prior and contemporaneous negotiations, understandings, and verbal agreements on the same subject." *See Ultracuts, Ltd. v. Wal-Mart Stores, Inc.*, 343 Ark. 224, 33 S.W.3d 128 (2000). Additionally, the Bank argues that C.D. Smith admitted by stipulation that the course-of-dealing evidence was not intended to interpret unambiguous terms contained in their agreement, and since such parol evidence does not interpret an existing word or term in the agreement, it fails to qualify as a "course of dealing." On this point, however, we quickly note that, although C.D. Smith stipulated that the parties' collection practices were not contained in their contract, it did not concede the Bank did not have the obligation to provide the delinquency lists under a "course of dealing." Finally on this point, the Bank, relying on § 4-2-202(a) and (b), submits that, while the parties' agreement may be explained or supplemented by course of dealing and evidence of consistent additional terms, such evidence is inadmissible if the court finds the parties intended the writing to be a complete and exclusive statement of the terms of their agreement. The Bank concludes that the merger clause clearly reflects the parties' intention at that time to have the written agreement serve as the complete and exclusive statement. We must disagree.

We first point out that, in arguing that course-of-dealing evidence may not be used to interpret an unambiguous agreement

which has a merger clause, the Bank relies on the *Ultracuts* and *Hagans* cases. However, both cases are non–Uniform Commercial Code cases and did not involve or discuss parol and course-of-dealing evidence, which may be allowed under circumstances described by the Code in §§ 4-1-205 and 4-2-202.

In their treatise on the Uniform Commercial Code, Professors James J. White and Robert S. Summers considered merger clauses and the parol-evidence rule by reviewing the Code language contained in § 2-202, and concluded such statutory language does not bar all evidence extrinsic to a writing already in evidence. 1 White & Summers, *Uniform Commercial Code* § 2-12, at 104 (4th ed. 1995). For example, a court may decide that the writing is a final written expression of some terms, but not a "complete and exclusive" statement of all terms, and admit evidence of "consistent additional terms." *Id.* Similarly, our court has stated that a course of dealing that explains or supplements a contract is competent evidence of the parties' intent and can become a part of a contract. *Precision Steel Warehouse*, 313 Ark. at 266 (citing § 4-2-202(a)).

In the instant case, we conclude that the trial court did not err in finding that the parties' November 12, 1996, agreement and its merger clause did not preclude course-of-dealing evidence, because the collection practices they adopted did not contradict the terms of the parties' agreement; rather, their collection practice merely supplemented their agreement. In other words, the Bank's provision of the delinquency lists to C.D. Smith was such a well-established "sequence of previous conduct between the parties" that it could "fairly be regarded as establishing a common base of understanding for interpreting their expressions and other conduct." *See* § 4-1-205(1).

The record reflects that Richard Wilson, C.D. Smith's son-in-law, testified that he was C.D. Smith's collection agent, and that he had been working with the Bank on collections since 1977. Wilson further testified that he had received a letter from Dwayne Johnson, the Bank's vice-president of commercial lending, saying that the Bank would not provide any more delinquency lists as of April 1997.

█ C.D. Smith clearly showed that it and the Bank had been engaging in these collection practices for twenty years, and C.D. Smith relied on these collection practices as the basis for keeping its accounts and collections current. This practice was not inconsistent with the contract. Indeed, the parties' engaging in this practice furthered the purpose of the parties' agreement. Under the terms of the agreement, C.D. Smith "unconditionally guarantee[d] the payment in full and performance of all obligations of each of the Account Debtors[4] under the Chattel Paper." The Agreement further provided the following:

> Upon any event of default under the Chattel Paper by the Account Debtor which is not cured within ninety (90) days or if the Account Debtor shall fail to make on the scheduled due date the installment payments due under the Chattel Paper on three consecutive months even if such default is cured within ninety (90) days, Borrower [C.D. Smith] shall, within five (5) days of demand by Bank, pay to Bank the unpaid balance owing on the Chattel Paper as of the date Borrower repurchases it from Bank (the "Repurchase Price").

The Bank's practice of providing its delinquency reports to C.D. Smith enabled Smith to "get on top of" its collections more efficiently, which in turn facilitated Smith's ability to perform its duties under the contract. We hold the trial court did not err in determining that this twenty-year-long "sequence of previous conduct" could "fairly . . . be regarded as establishing a common basis of understanding" between Smith and the Bank, and therefore the court did not err in admitting evidence of this course of dealing. Although the Bank also argues that such evidence was highly prejudicial and confusing to the jury, we note the obvious, that any competent evidence tending to prove the Bank's actions had breached the parties' agreement and caused C.D. Smith damages, would be prejudicial. However, we cannot agree that the trial court abused its discretion in determining such course-of-dealing evidence was more probative than prejudicial.

█ The Bank's next point for reversal is that C.D. Smith's damages were all consequential, but Smith failed to offer proof

---

[4] The "account debtors" were those persons who had purchased cars from C.D. Smith and had financed that purchase through C.D. Smith's recourse financing.

supporting such damages. The Bank claims — and C.D. Smith does not dispute — that all damages awarded in this case were consequential. Consequential damages are those damages that do not flow directly and immediately from the breach, but only from some of the consequences or results of the breach. *See Dawson v. Temps Plus, Inc.*, 337 Ark. 247, 987 S.W.2d 722 (1999). Here, the damages received by C. D. Smith consist of $1.066 million for its lost profits or for the loss of its business. The parties agree that both forms of damages are consequential in nature, and any such damages would have been an indirect consequence of the Bank's termination of the parties' agreement and C.D. Smith's loss of a source of financing. *See Smith v. Walt Bennett Ford, Inc.*, 314 Ark. 591, 864 S.W.2d 817 (1993) (holding that lost profits are well recognized as a type of consequential damages).

■ ■ The Bank first cites *Morrow v. First National Bank*, 261 Ark. 568, 550 S.W.2d 429 (1977), where this court, relying on *Hooks Smelting Co. v. Planters Compress Co.*, 72 Ark. 275, 79 S.W. 1052 (1904), noted it had adopted what is known as the "tacit-agreement test" for the recovery of consequential damages for a breach of contract. By that two-prong test, the plaintiff must prove more than the defendant's mere knowledge that a breach of contract will entail special damages to the plaintiff; it must also appear that the defendant at least tacitly agreed to assume responsibility. *Id.* In discussing the rationale of the tacit-agreement test, the *Morrow* court relied heavily on the *Hooks Smelting* decision, which held as follows:

> It seems then that mere notice is not always sufficient to impose on the party who breaks a contract damages arising by reason of special circumstances, and the reason why this is so was referred to in a recent decision by the supreme court of the United States. In that case Mr. Justice Holmes, who delivered the opinion of the court, after remarking that one who makes a contract usually contemplates performance, not a breach, of his contract, said: "The extent of liability in such cases is likely to be within his contemplation, and whether it is or not, should be worked out on terms which it fairly may be presumed he would have assented to if they had been presented to his mind."
> *Globe Refining Co. v. Landa Oil Co.*, 190 U.S. 540 (1903).
> Now, where the damages arise from special circumstances, and are so large as to be out of proportion to the consideration agreed to be paid for the services to be rendered under the con-

tract, it raises a doubt at once as to whether the party would have assented to such a liability had it been called to his attention at the making of the contract unless the consideration to be paid was also raised so as to correspond in some respect to the liability assumed. To make him liable for the special damages in such a case, there must not only be knowledge of the special circumstances, but such knowledge "must be brought home to the party sought to be charged under such circumstances that he must know that the person he contracts with reasonably believes that he accepts the contract with the special condition attached to it." *In other words, where there is no express contract to pay such special damages, the facts and circumstances in proof must be such as to make it reasonable for the judge or jury trying the case to believe that the party at the time of the contract tacitly consented to be bound to more than ordinary damages in case of default on his part.* [Citations omitted.]

*Hooks Smelting*, 72 Ark. at 286–87 (emphasis added).

In *Hooks Smelting*, the court reversed an award of damages to a cotton compress company alleged to have arisen out of the smelting company's failure to properly manufacture an engine part; the compress company had successfully argued that the smelting company's mistakes had caused the compress company to have to pay wages during a time when the compressing machine was not in working order, among other consequential damages. The court held that there had been no facts presented that would have demonstrated that the smelting company was aware of the special circumstances posed by the compress company, and there was nothing to prove that the smelter knew or should have known that, in the event it failed to carry out the contract, the compress company would reasonably expect it to make good on the special loss sustained.

Likewise, in *Morrow, supra,* this court affirmed a summary judgment in favor of a bank. Appellant Morrow had contacted the bank about renting a safety deposit box in order to securely house his extensive and valuable coin collection. Morrow testified that when he agreed to rent the boxes in June of 1971, he had explicitly informed the bank that he needed the boxes by September 1, when his teenage son would leave for college. One or two bank employees promised to notify Morrow when the boxes became available. On September 4, someone broke into Morrow's house and stole a portion of his coin collection valuing

$32,155.17. Morrow subsequently found out that the boxes had become available on August 30, but the bank employees "just didn't have time" to notify him.

Morrow sued the bank to recover the value of the stolen coins, alleging that the bank had failed to notify him when the boxes were ready. The trial court granted the bank's motion for summary judgment, and this court affirmed, concluding that there had been no proof to support a finding that the bank, in return for box rentals totaling $75, had effectively agreed to issue a burglary insurance policy to Morrow. "The bank's bare promise to notify the plaintiffs as soon as the boxes were available did not amount to a tacit agreement that the bank, for no consideration in addition to its regular rental for the boxes, would be liable for as much as $32,000 if the promised notice was not given." *Morrow*, 261 Ark. at 572.

Bank of America raises the same argument here, asserting that there was no testimony or evidence that it was made aware of any special damages — such as going out of business — that would have resulted from a breach of the Agreement, nor was there any evidence that the Bank tacitly agreed to be liable for such consequential damages.

C.D. Smith counters the Bank's position and submits that Smith did present evidence that, under the facts and circumstances of this case, made it reasonable for the jury trying this dispute to believe that the Bank, at the time of their contract, tacitly consented to be bound to more than ordinary damages in case of a default on the Bank's part. C.D. Smith testified that, prior to the new November 12, 1996, agreement, Smith's recourse–financing limit was reduced by the Bank from $4 million to $2.3 million. In that agreement, the Bank also requested that C.D. Smith pay a 15% down payment, which Smith negotiated down to 10%. These new requirements gave Smith some serious concerns.

At trial, C.D. Smith was asked if he recalled what occurred on the day the Bank's vice president of commercial lending, Dwayne Johnson, brought the Bank's agreement for Smith's signature. Smith said that he signed the November 12, 1996, contract, and told Johnson, "If you don't honor that contract, *I am going to hold the Bank responsible*." Moreover, the Bank's president, David Moore, testified that he "believed *Smith* may have *told*

*Dwayne Johnson,* upon signing the November 12, 1996, agreement, *that [ Smith] would look to the Bank for compensation if his business was destroyed.*" (Emphasis added.) *Cf. Sager v. Jung & Sons Co.,* 143 Ark. 506, 220 S.W.801 (1920) (holding that evidence was sufficient to show that, at the time the parties entered into the contract, they contemplated that, unless a car load of coal was delivered by Jung & Sons, Sager would lose his rice crop for the season and thereby sustain large damages; therefore, this court concluded that Jung & Sons had consented to be bound for the special damages that would result to Sager as a result of Jung & Sons' failure to comply with the terms of the contract).

 As was made clear in *Hooks Smelting,* because the Bank had knowledge or notice of special circumstances which may cause special damages to follow if the contract was broken, the fact that the Bank accepted the contract under such circumstances constituted sufficient evidence to support a finding by the jury that the Bank did so knowing that, in the event of its failure to perform its contract, C.D. Smith would reasonably expect that the Bank should make good the loss incurred by reason of the special circumstances when such loss flowed naturally from the breach of contract. *See Hooks Smelting,* 72 Ark. at 287-88. "Each case of this kind must rest on its own merits, and the findings of the jury upon the facts may be reviewed as in other cases, and will be set aside when justice requires that it be done." *Id.* at 288. In other words, the question of whether notice of the special circumstances was given to the breaching party is not a question of law, but of fact. *Id.* at 287.

 Here, at the time of the signing of the parties' agreement, the Bank's vice president of commercial lending, Mr. Johnson, accepted the agreement upon C.D. Smith's signing it, knowing full well that Smith had expressly stated that he intended to hold the Bank liable if the Bank did not honor the November 12, 1996, agreement. Additionally, as previously discussed, the Bank's president, Mr. Moore, testified regarding his knowledge that Smith may have told Johnson at the time of signing the agreement, that Smith would look to the Bank for compensation if his business were destroyed. Of course, the Bank argues that no one from the Bank agreed to C.D. Smith's special damages; it also contends the Bank did not agree to pay for loss of business damages in the event it terminated the parties' agreement. However,

as to conflicting evidence presented in this case, it was up to the jury to resolve the conflicts in the testimony and judge the weight and credibility of the evidence. *Cadillac Cowboy, Inc. v. Jackson*, 347 Ark. 963, 69 S.W.3d 383 (2002). In viewing the evidence in the light most favorable to appellee C.D. Smith, we hold there was sufficient evidence for the jury to have determined that the Bank tacitly agreed to pay special damages to C.D. Smith when it accepted the contract under the facts described in this case.

 Before leaving this point, we note the Bank's final argument regarding the "tacit-agreement issue." It argues that, even setting aside any failure of the evidence on this point, any alleged agreement by the Bank to assume responsibility for consequential damages would be barred by the agreement's merger clause. The Bank again cites *Hagans*, 64 Ark. App. at 163-64, for its statement that the trial court should not have admitted testimony concerning a previous agreement because it was an abrogation of the terms of the written contract, including the comprehensive merger clause. Of course, as we already have discussed, *Hagans* is a non-commercial code case and renders us little assistance. However, as C.D. Smith points out, even in *Hagans*, merger clauses only preclude evidence of matters referred to within the contract. *Hagans*, 64 Ark. App. at 164. The *Hagans* court relied on the rule that parol testimony is inadmissible if it tends to alter, vary, or contradict the written contract, but *is* admissible if it tends to prove a part of the contract about which the written contract is silent. *Id.* at 163. Also, as previously stated, a merger clause does not necessarily bar all evidence extrinsic to a writing already in evidence.[5] Once again, here, the parties'

---

[5] On this issue, we point again to White & Summers, who discuss the effect of merger clauses on the admissibility of extrinsic evidence as follows:

> This . . . language [in Uniform Commercial Code § 2-202] does not bar all evidence extrinsic to a writing already in evidence. A court may decide that the writing is not a "final written expression" as to any terms and admit the evidence. A court may decide that the writing is a final written expression of some terms, but not a "complete and exclusive" statement of all terms, and admit evidence of "consistent additional terms." A court may decide that the writing is a final written expression as to terms and also that the writing is a "complete and exclusive statement," yet admit evidence of course of dealing, usage of trade, or course of performance to "explain" the meaning of terms in the writing.

1 White & Summers, *Uniform Commercial Code*, § 2-12, at 104 (4th ed. 1995).

November 12, 1996, agreement is silent as to what remedies C.D. Smith had in the event *the Bank* defaulted on the agreement. While the Bank seems to suggest that C.D. Smith was somehow limited to compensatory damages by the parties' execution of the 1996 agreement, the Bank fails to direct our attention to such a requirement in that agreement. To the contrary, it was shown that, if C.D. Smith was able to present sufficient proof to support an award of consequential damages, Smith was entitled to such damages in these circumstances.

The Bank's final point on direct appeal is that the damage award was against the clear preponderance of the evidence, because the damages were not caused by the Bank's breach, and because the evidence was speculative. Further, the Bank contends that the damages were not reasonably certain.

First, the Bank argues that Smith failed to establish that its damages were caused by the Bank's breach. Damages must arise from the wrongful acts of the breaching party. *Dawson v. Temps Plus, supra.* On appeal, this court views the evidence in the light most favorable to the appellee and affirms if there is substantial evidence to support the jury's verdict. *American Fidelity Fire Ins. Co. v. Kennedy Bros. Const.*, 282 Ark. 545, 670 S.W.2d 798 (1984). Our cases give the factfinder, jury, or trial court some latitude in its decision in awarding damages when arriving at a figure and have not required exactness on the proof of damages. *See Lancaster v. Schilling Motors, Inc.*, 299 Ark. 365, 772 S.W.2d 349 (1989); *Moore Ford Co. v. Smith*, 270 Ark. 340, 604 S.W.2d 943 (1980); *see also Jim Halsey Co. v. Bonar*, 284 Ark. 461, 683 S.W.2d 898 (1985). If it is reasonably certain that some loss has occurred, it is enough that they can be stated only proximately. *Dr. Pepper Bottling Co. v. Frantz*, 311 Ark. 136, 842 S.W.2d 37 (1992).

The Bank asserts that C.D. Smith's expert, David Ray, testified that he did not know why Smith lost profits beginning in 1997. The Bank emphasizes Ray's testimony wherein he replied "yes" to the question, "Now, going back with the flow, by looking at the chart itself, you can tell what happened, but you can't tell why it happened. Is that a true statement?"

However, Ray, a CPA for twenty years, also testified that Smith showed a loss for the first time in 1997, when the Bank

terminated its financing to C.D. Smith; Ray also stated that a loss of financing would make it "more difficult to obtain financing through other banks" because "bankers tend to want to lend money to people who aren't in desperate situations." He further stated that, although the chart he had prepared did not indicate why the business was sustaining a loss beginning in 1997, he "believed that there is a strong correlation [between the breach and the beginning of the losses] inasmuch as the breach of contract happened in 1997 and, after years of profitability, suddenly the business began to lose money."

Smith's brief reflects a table that summarizes Ray's testimony regarding C.D. Smith's loss during the 1990s. Ray examined Smith's sales figures, gross profit, and net income for the years 1990 through 1999, and those sales and net profit figures are as follows:

| Year | Sales | Net Profit/Loss |
|------|-------|-----------------|
| 1990 | $2,900,000 | $195,000 |
| 1991 | $2,500,000 | $145,000 |
| 1992 | $3,200,000 | $251,000 |
| 1993 | $2,700,000 | $276,000 |
| 1994 | $3,200,000 | $300,000 |
| 1995 | $3,400,000 | $236,000 |
| 1996 | $3,600,000 | $209,000 |
| 1997 | $2,765,000 | ($51,000) |
| 1998 | $678,000 | ($233,000) |
| 1999 | $133,000 | ($75,000) |

Ray testified that, for the five years before 1997, the average net income of the business was approximately $255,000 per year. Based on mathematical models, and based on past data and future trends, Ray calculated that lost profits from 1997 forward to the date of trial would be $1,124,000. He arrived at that figure by taking the average profits for the preceding five years and adding to that the amount of the loss that was sustained. Although he conceded on cross-examination that projecting averages necessarily depended on a number of variables, he nevertheless con-

cluded that "something dramatic impacted that business in 1997," and it was "most likely that the loss of financing is what caused the profits to drop so." Although the Bank offered evidence contrary to Ray's analysis and opinion, we believe there was substantial evidence from which the jury could conclude that the Bank's breach of contract caused Smith's damages.

█ █ The Bank's next argument is that the damages were too speculative. When a party seeks to recover anticipated profits under a contract, he must present a reasonably complete set of figures to the jury and should not leave the jury to speculate as to whether there could have been any profits. *Little Rock Waste-water Util. v. Larry Moyer Trucking.*, 321 Ark. 303, 902 S.W.2d 760 (1995); *American Fidelity Fire Ins. Co. v. Kennedy Bros. Constr. Co., Inc.*, 282 Ark. 545, 670 S.W.2d 798 (1984). Lost profits must be proven by evidence showing that it was reasonably certain the profits would have been made had the other party carried out its contract. *American Fidelity*, 282 Ark. at 546; *Reed v. Williams*, 247 Ark. 314, 775 S.W.2d 90 (1969). Such proof is speculative when based upon such factors as projected sales when there are too many variables to make an accurate projection. *Little Rock Waste-water*, 321 Ark. at 312; *see also Sumlin v. Woodson*, 211 Ark. 214, 199 S.W.2d 936 (1947). In *Kennedy Bros. Constr. Co.*, this court upheld an award of profits when the appellee lost a bid from the U.S. Army Corps of Engineers because of a faulty surety bond. *Kennedy Bros. Const. Co.*, 282 Ark. at 546, 670 S.W.2d at 799. The figures presented to the jury were based upon the cost of the job if it had been completed within the contract time. The work was not done because the bid was lost; therefore, expert testimony was used to estimate the figures, and this court held the damages were reasonably accurate. *Id.* at 547.

█ Arkansas law has never required exactness of proof in determining damages, and if it is reasonably certain that some loss occurred, it is enough that damages can be stated only approximately. *Morton v. Park View Apts.*, 315 Ark. 400, 868 S.W.2d 448 (1993); *Jim Halsey Co. v. Bonar, supra.* "The fact that a party can state the amount of damages he suffered only approximately is not a sufficient reason for disallowing damages if from the approximate

estimates a satisfactory conclusion can be reached." *Halsey*, 284 Ark. at 468.

Here, Smith presented the jury with a set of figures showing the company's historical profit level, and the precipitous drop in those profits, which were the first losses the business had posted. These figures were arrived at by the company's CPA employing a mathematical formula to calculate the numbers based on past figures. The facts and figures Ray used provided the jury with a "reasonably complete set of figures from which to determine the amount of profits lost," *see Smith v. Walt Bennett Ford, supra,* and the foregoing evidence meets that requisite level of certainty.

We now turn to C.D. Smith's cross-appeal, wherein Smith first contends that the trial court was wrong in ruling that the Bank was not subject to punitive damages. The trial court in this case initially ruled that Smith could seek punitive damages under Ark. Code Ann. § 4-1-203 (Repl. 2001). That statute provides that "[e]very contract or duty within this subtitle imposes an obligation of good faith in the performance or enforcement." This court held in *Gordon v. Planters & Merchants Bankshares*, 326 Ark. 1046, 935 S.W.2d 544 (1996), that punitive damages are allowable under the UCC whenever a wrongdoer acts wantonly in causing the injury or with such conscious indifference to the consequences that malice may be inferred.

However, the trial court subsequently ruled that Ark. Code Ann. § 16-64-130 (Supp. 2001) barred Smith from seeking punitive damages. That statute, captioned "Punitive damage — Contract involving financial institutions," provides in relevant part as follows:

> (b) This section shall be applicable in civil actions in which a claim is asserted against a financial institution, whether by complaint, counterclaim, third party complaint, or other pleading. *If a claim asserted against a financial institution is determined by the court to be a breach of contract claim arising out of a loan of money or other extension of credit by the financial institution to the person asserting the claim, then,* unless it is found that the person asserting the claim suffered personal injury or physical damage to property as a result of the financial institution's alleged action or inaction, *punitive damages shall not be awarded to the person asserting the claim.*

(Emphasis added.)

 Smith argues that its claim was not a "breach of contract claim arising out of a loan of money or other extension of credit by the financial institution," and that the statute has no application to a contract that provides for the *purchase* of chattel paper. However, Smith offers no substantive analysis of its assertion that "the fact that Smith guaranteed the makers' obligations is [outside] the ambit of § 16-64-103(b) [because there] is no loan of money or extension of credit[.]" In fact, the parties' November 12, 1996, agreement very clearly establishes Smith as the "Borrower," and the Bank had full recourse against C.D. Smith as guarantor if an account debtor defaulted on his or her debt. We conclude that the trial court did not err by finding the Bank extended credit to C.D. Smith, making § 16-64-130 applicable, and thereby preventing Smith from seeking punitive damages in this case.

Finally, Smith argues that the trial court should have set post-judgment interest at 10%, instead of 6.25%. He cites Ark. Code Ann. § 16-65-114(a) (1987), which provides as follows:

> Interest on any judgment entered by any court or magistrate on any contract shall bear interest at the rate provided by the contract or ten percent (10%) per annum, whichever is greater, and on any other judgment at ten percent (10%) per annum, *but not more than the maximum rate permitted by the Arkansas Constitution, Article 19, Section 13*, as amended.

(Emphasis added.) Smith then argues that "the constitutional provision does not apply to interest on judgments," citing *Carroll Electric Cooperative Corp. v. Carlton*, 319 Ark. 555, 892 S.W.2d 496 (1995).

However, *Carroll Electric Cooperative* was a tort case and did not involve a judgment on a contract, which is the subject of § 16-65-114. Further, the language in *Carroll Electric Cooperative* stating that "Article 19, section 13 of the Constitution does not apply to interest on judgments," is based on obiter dicta from *McElroy v. Grisham*, 306 Ark. 4, 810 S.W.2d 933 (1991), wherein the court stated that "Article 19 voids only the payment of interest under [a] usurious contract and has nothing to do with the interest due on the judgment amount."

The language of § 16-65-114(a) prohibits a postjudgment interest in excess of the interest rate permitted by the Arkansas Constitution; Ark. Const. art. 19, § 13, prohibits the collection of interest in excess of "five percent per annum above the Federal Reserve Discount Rate at the time of the contract." Although Bank of America notes that, at the time the judgment was entered in this case, the Federal Reserve Discount Rate was 1.25%, this tells us nothing about what the rate was "at the time of the contract." This issue should be remanded for the trial court to determine what the rate was as of November 12, 1996, the date the contract was signed.

In *Chambers v. Manning*, 315 Ark. 369, 868 S.W.2d 64 (1993), this court remanded a case in order to determine the appropriate interest rate consistent with the Constitution. There, the trial court had imposed a postjudgment interest rate of 6%. Citing § 16-65-114(a), this court held that it was error for the court to simply impose the 6% rate, writing as follows:

> [That section] clearly provides for imposing the greater of the contract rate, ten percent, or the maximum rate allowed by the Arkansas Constitution. As we cannot determine whether ten percent would have been a legal (non-usurious) rate in September 1992, we must remand this case to the Chancellor for entry of an order that imposes post-judgment interest in accordance with § 16-65-114.

*Chambers*, 315 Ark. at 377-78.

In accordance with *Chambers*, we likewise reverse and remand on this issue. It may be that Smith was entitled to ten percent; it may be that the figure was something less than that. However, neither side has provided us with figures so we can ascertain what the Federal Reserve Discount Rate was in November of 1996 — "at the time of the contract," pursuant to § 16-65-114. Therefore, we reverse and remand on the second point of C.D. Smith's cross-appeal; the case is affirmed on direct appeal and on point one of the cross-appeal.