In re BRANKLE BROKERAGE & LEASING, INC., Debtor

Brankle Brokerage & Leasing, Inc., Plaintiff

v.

Volvo Financial Services, Defendant.

Bankruptcy No. 07–10450.
Adversary No. 07–1169.

United States Bankruptcy Court,
N.D. Indiana,
Fort Wayne Division.

Sept. 18, 2008.

Grant F. Shipley, Laura M. Boyer, Shipley & Associates, Fort Wayne, IN, for Plaintiff.

Susan M. Argo, Graydon Head & Ritchey LLP, Cincinnati, OH, for Defendant.

## DECISION

ROBERT E. GRANT, Bankruptcy Judge.

The Bankruptcy Code treats lessors differently than it does secured creditors. Secured creditors can have their rights modified, and any shortfall in the amounts due them is generally nothing more than an unsecured claim. The estate is limited to assuming or rejecting an unexpired lease, and pending that decision, except for a brief hiatus, is generally supposed to perform all obligations under the lease, including making required payments, effectively giving lessors an administrative or priority claim. *See generally, In re Grubbs Construction, Co.,* 319 B.R. 698, 710–11. Because of these differences, unless there is enough money to fully satisfy all of the debtor's obligations to all of its creditors, it is often necessary to determine whether an agreement between the debtor and a creditor is a "true lease" or a "security agreement." That is the issue in this adversary proceeding. The Chapter 11 debtor-in-possession has asked the court to determine whether an agreement between Brankle Brokerage and Volvo Financial Services is a lease or a financing device. The matter is before the court following trial of that issue and the submission of briefs from counsel.[1]

Prior to the date of its petition for relief under Chapter 11, the debtor, Brankle Brokerage, leased six Volvo truck-tractors from the defendant, Volvo Financial. The overall terms and conditions of those leases were set out in a single "Master Lease Agreement" (Exhibit A) and the individual details concerning the leased property, the lease payments, and the various due dates were set out in three separate "Terminal Rental Adjustment Clause Schedules" (Exhibits B, C, and D) to that master agreement. In each instance, the base lease term was for a period of sixty months. During this time, the debtor was required to make regular monthly rental payments, as well as to insure the vehicles, maintain them, pay all taxes, fees and assessments due on their account and bore all risk of the vehicles' loss. The debtor could not terminate the agreement for any reason whatsoever. Master Lease Agreement ¶ 4.

At the conclusion of the 60–month lease term, the debtor had three options. It could: (a) purchase the vehicles for a "purchase price" which was equal to 20 percent

---

1. An undercurrent running through the defendant's briefs seems to be that it is somehow unfair for the debtor to have entered into a lease with Volvo Financial, knowing full well that the agreement purported to be a lease, and now, after seeking relief under Chapter 11, to contend that the agreement really constitutes a secured transaction. If the debtor was seeking that relief simply for itself, as the debtor, the argument might have some merit. But this action is not being prosecuted by the debtor, as debtor, but by the debtor-in-possession, as the representative of the bankruptcy estate, for the benefit of creditors, and that makes all the difference in the world. A Chapter 11 debtor-in-possession is the functional equivalent of a bankruptcy trustee, having not only the powers of a trustee but also the obligation to perform the trustee's duties. 11 U.S.C. § 1107(a). "The debtor-in-possession is considered to be a separate legal entity from the debtor himself." *In re Gordon Sel–Way, Inc.,* 270 F.3d 280, 290–91 (6th Cir. 2001). *See also, N.L.R.B v. Bildisco and Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) (the debtor in possession has different abilities and rights which it did not have prior to the bankruptcy). Since the prepetition debtor and the post-petition debtor-in-possession are not one and the same, there is no unfairness, inequity, or impropriety in the attempt to recharacterize the pre-petition agreement between Brankle Brokerage and Volvo Financial. Indeed, the debtor-in-possession's trustee duties may require it.

of Volvo Financial's cost for the vehicles,[2] (b) sell the vehicles on Volvo Financial's behalf, so long as the net sale proceeds were not (without Volvo Financial's consent) less than the 20 percent purchase price due if the option to purchase was exercised, or (c) return the vehicles to Volvo Financial and upon doing so pay "an amount equal to the [20 percent option] purchase price" whereupon Volvo Financial would endeavor to sell them. Following a sale, any amounts received in excess of the 20 percent purchase price (plus any unpaid amounts due Volvo Financial) belonged to the debtor and would be paid to, or kept by, it; any shortfall was to be immediately paid by the debtor to Volvo Financial. Thus, regardless of which option the debtor chose—purchase, sell, or have Volvo Financial sell—at the end of each 60 month lease the debtor was required to pay Volvo Financial the 20 percent purchase price, and over the entire term of the agreement Volvo Financial was to receive the stated monthly rental plus the 20 percent purchase price. Consequently, assuming all the monthly rentals had been paid when due, the debtor stood to benefit if, at the end of the lease term, the vehicles were worth more than the 20 percent purchase price and it also bore the risk that the vehicles might be worth less than that amount.

■ As the one contending the agreement is something other than what it purports to be, the plaintiff bears the burden of proving that it is disguised security interest rather than a lease. *In re Pillowtex, Inc.*, 349 F.3d 711, 717 (3rd Cir.2003); *In re QDS Components, Inc.*, 292 B.R. 313, 321 (Bankr.S.D.Ohio 2002). *See also, Au-*

*burndale State Bank v. Dairy Farm Leasing Corp.*, 890 F.2d 888, 893 (7th Cir.1989). The issue is governed by the applicable non-bankruptcy law. *In re Powers*, 983 F.2d 88, 90 (7th Cir.1993). In this instance, despite plaintiff's arguments to the contrary, because of the choice of law provisions in the master lease, that law is North Carolina's version of the Uniform Commercial Code.

■ The relevant portions of North Carolina's version of the U.C.C. are slightly different, both in numbering and in some wording, from the language of the official version. To begin with, a lease is defined as

a transfer of the right to possession and use of goods for a term in return for consideration, but a sale, including a sale on approval or a sale or return, or retention or creation of a security interest is not a lease. Unless the context clearly indicates otherwise, the term includes a sublease. *The term includes a motor vehicle operating agreement that is considered a lease under § 7701(h) of the Internal Revenue Code.* N.C. Gen.Stat. Ann. § 25–2A–103(j).

The italicized portion of the statute represents a non-uniform addition to U.C.C. § 2A–103(j). Since there is no dispute that the agreement in question qualifies as a lease under § 7701(h) of the Internal Revenue Code (a TRAC lease)[3] Volvo Financial argues this definition ends the debate.

As appealing as Volvo Financial's argument might initially seem to be, North Carolina law has more to say on the subject of distinguishing leases from security

---

**2.** This cost was set out in the lease schedules and varied slightly from $96,372.79 each for the first three vehicles, $96,372.96 for the second two, and $93,600.96 for the sixth.

**3.** Section 7701(h) of the Internal Revenue Code provides that an agreement containing a terminal rental adjustment clause is treated as a lease for federal tax purposes. *See,* 26 U.S.C. § 7701(h).

agreements. In fact, there is an entire section devoted to just that issue. *See,* N.C. Gen.Stat. Ann. § 25–1–203. Furthermore, in the course of defining the term "security interest," North Carolina made another non-uniform addition to the U.C.C. Its definition for that term corresponds to the first paragraph of U.C.C. § 1–201(37) but adds another sentence which states: "Whether a transaction in the form of a lease creates a 'security interest' is determined pursuant to G.S. 25–1–203." N.C. Gen.Stat. Ann. § 25–1–201(b)(35). That section, N.C. Gen.Stat. Ann. § 25–1–203, which is titled "Lease distinguished from security interest," lays out the various principles and considerations to be evaluated in determining the issue and, with some minor changes, corresponds to the remaining portions of U.C.C. § 1–201(37).

■ Taken together, North Carolina's statutory scheme is quite explicit. Whether a particular agreement—"a transaction in the form of a lease"—constitutes a lease or a security interest is determined not by the individual definitions of those terms but by the provisions of G.S. 25–1–203. Furthermore, if the North Carolina legislature had intended to declare that TRAC leases always constitute leases and to insulate them from scrutiny under 25–1–203 it would have worded its statutes much differently, either by placing 103(j)'s unique provisions concerning TRAC leases directly in 25–1–203 or in the definition of security interest, as some type of exclusion. As it is, however, the plain language of these provisions begins by characterizing TRAC leases as leases but then directs that 25–1–203 be consulted to determine whether a particular lease is what it appears to be or creates a security interest. So, that is the path this court will follow.

N.C. Gen.Stat. Ann. § 25–1–203 reads:

(a) Whether a transaction in the form of a lease creates a lease or security interest is determined by the facts of each case.

(b) A transaction in the form of a lease creates a security interest if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee, and:

(1) The original term of the lease is equal to or greater than the remaining economic life of the goods;

(2) The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;

(3) The lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement; or

(4) The lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement.

(c) A transaction in the form of a lease does not create a security interest merely because:

(1) The present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into;

(2) The lessee assumes risk of loss of the goods;

(3) The lessee agrees to pay, with respect to the goods, taxes, insurance, filing, recording, or registration fees, or service or maintenance costs;

(4) The lessee has an option to renew the lease or to become the owner of the goods;

(5) The lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed; or

(6) The lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

(d) Additional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised. Additional consideration is not nominal if:

(1) When the option to renew the lease is granted to the lessee, the rent is stated to be the fair market rent for the use of the goods for the term of the renewal determined at the time the option is to be performed; or

(2) When the option to become the owner of the goods is granted to the lessee, the price is stated to be the fair market value of the goods determined at the time the option is to be performed.

(e) The "remaining economic life of the goods" and "reasonably predictable" fair market rent, fair market value, or cost of performing under the lease agreement must be determined with reference to the facts and circumstances at the time the transaction is entered into.

■ The court is not aware of any decisions, from North Carolina or elsewhere, applying N.C. Gen.Stat. Ann. § 25–1–203. Yet, despite differences in format and the helpfully different designation of paragraphs, this part of North Carolina's version of the U.C.C. is substantially identical to the latter portions of U.C.C. § 1–201(37) [4] as it has been adopted elsewhere. As a result, given the lack of guidance from North Carolina's courts, this court can look to decisions from other jurisdictions applying U.C.C. § 1–201(37) for assistance in applying North Carolina's version of that same statute. *In re Grubbs Construction Co.,* 319 B.R. 698, 712 (Bankr.M.D.Fla.2005); *In re Murray,* 191 B.R. 309, 314 (Bankr.E.D.Pa.1996).

■ N.C. Gen.Stat. Ann. § 25–1–203 begins by stating the governing principle that whether a particular transaction "creates a lease or security interest is determined by the facts of each case." N.C. Gen.Stat. Ann. § 25–1–203(a). This is a change from the previous version of § 1–201(37), where the issue turned on what the parties had intended. The result of this change it is to make the determination a much more objective one, based upon the economic realities of the transaction, rather than on the more obscure intent of the parties. *See, Pillowtex,* 349 F.3d at 721–722; *In re Ecco Drilling Company, Ltd.,* 390 B.R. 221, 226 (Bankr.E.D.Tex.2008); *Grubbs Construction Co.,* 319 B.R. at 715; *In re Charles,* 278 B.R. 216, 222 (Bankr. D.Kan.2002). The second part of the section, 1–203(b), lays out a bright-line test or per se rule which, if satisfied, mandates the conclusion that the agreement constitutes a security interest, rather than a lease, as a matter of law. *Pillowtex,* 349 F.3d at 717; *Ecco Drilling,* 390 B.R. at

---

**4.** U.C.C. § 1–201(37)(z), which defines present value, has been enacted in North Carolina as N.C. Gen.Stat. Ann. § 25–1–201(28).

227. If the agreement does not constitute a security interest as a matter of law under § 1–203(b), the court must then "examine all the facts to determine whether the economic realities of a particular transaction nevertheless create a security interest." *Grubbs Construction*, 319 B.R. at 714. *See also, Pillowtex*, 349 F.3d at 719. It is at this point that the third operative portion of § 1–203—§ 1–203(c)—comes into play. "Focusing on the economics of the transaction, it states that a security interest is not created merely because it contains any of the [six] terms enumerated in [that] paragraph." *QDS Components*, 292 B.R. at 332; *Murray*, 191 B.R. at 315 (both quoting *In re Lerch*, 147 B.R. 455, 460 (Bankr.C.D.Ill.1992).

Although the court need not hold that the agreement between Brankle Brokerage and Volvo Financial constitutes a security interest as a matter of law, under § 1–203(b), that may very well be the case. The first part of that bright line test has undeniably been satisfied. The debtor was obligated to pay Volvo Financial for the entire term of the agreement and did not have the ability to terminate it. Consequently, if one of the other four conditions of § 1–203(b) has been satisfied, the agreement created a security interest as a matter of law. Of them, it is the last, § 1–203(b)(4), that is applicable here. It asks whether "[t]he lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement." N.C. Gen.Stat. Ann. § 25–1–203(b)(4).

Volvo Financial argues that § 1–203(b)(4) does not apply because the 20 percent purchase price the debtor was required to pay at the end of the sixty-month lease term constitutes additional consideration and is not a nominal amount. But this argument looks at the wrong moment in time. The statute does not ask whether the debtor has the option to become the owner of the goods for no additional consideration or for nominal additional consideration at the expiration of the lease term. Instead, it asks whether the debtor has that opportunity "for no additional consideration ... *upon compliance with the* lease *agreement.*" The statute seems to require that the inquiry be made at the end of the entire agreement, looking at the debtor's performance of all of its obligations under the agreement, and not simply part way through the debtor's fulfillment of those inescapable duties. *Cf., Pillowtex*, 349 F.3d at 723 ("the economic realities analysis not only permits, but *requires* us to examine the state of affairs at the end of the [agreement's] term.") (emphasis original). *See also, Agricultural Management Development, Inc. v. National City Bank*, 2003 WL 21919184 * 16 (N.D.Ind.2003)("once Winger complied with the terms of the leases, he effectively owned the hogs, and was entitled to reap the benefit of his equitable interest in them."). If we ask: "What was the debtor's obligation at the end of the agreement?"—it was, quite simply, to pay Volvo Financial 20 percent of each vehicle's cost. It could do so in one of three ways—pay the money itself and become the owner of the vehicles, raise the needed money by selling the vehicles, or deliver the vehicles (along with the 20 percent purchase price) to Volvo Financial for it to sell and await a refund of any over payment after the disposition was complete. In each instance, however, the operative concept was for the debtor to pay, and the required payment was the precisely the same regardless of whether the debtor chose to purchase the vehicles, sell them to a third party, or have Volvo Financial do so. One way or the other, the debtor had to pay Volvo Financial 20 percent of each vehicle's cost and one way of doing so

was to buy them itself. Thus, in light of all the debtor's obligations under the agreement in question, it certainly appears that the debtor had the option to become the owner of the goods for no additional consideration.[5] *Accord, Agricultural Management Development,* 2003 WL 21919184 at **16–17.

■■■■■ The court does not need to determine whether the agreement between Brankle Brokerage and Volvo Financial constitutes a security interest as a matter of law, under § 1–203(b), because it is clear that when the particular facts of the case are analyzed in light of the considerations of § 1–203(c), the economic realities of the transaction lead to the same conclusion. This part of the analysis requires the court to consider the overall import of the entire transaction, rather than particular bits and pieces of it. That is the purpose § 1–203(c) which, in essence, counsels that the presence of particular types of provisions in the agreement is not, by itself, sufficient to lead to conclusion that the agreement creates a security interest. N.C. Gen.Stat. Ann. § 25–1–203 ("a transaction ... does not create a security interest merely because....").

The central feature of a true lease is the reservation of an economically meaningful interest to the lessor at the end of the lease term. Ordinarily, this means two things: (1) at the outset of the lease did the parties expect the goods to retain some significant residual value at the end of the lease term; and (2) the lessor retains some entrepreneurial stake (either the possibility of gain or the risk of loss) in the value of the goods at the end of the lease term. 4 White &

Summers, Uniform Commercial Code § 30–1, p. 15 (5th ed.2002). *See also, Grubbs Construction,* 319 B.R. at 715. A key, some would say pivotal, consideration in this regard is whether the lessee acquires some type of ownership or equity interest in the property. *Grubbs Construction,* 319 B.R. at 719. *See also, Agricultural Management Development,* 2003 WL 21919184 at **16–17. As stated by various courts that have confronted the issue:

[I]n order for the Lease to have created a security interest it must have provided the debtor with some ownership interest in the Vehicle. *Murray,* 191 B.R. at 316.

Courts being guided by the amended UCC § 1–201(37) have considered whether the lessor retains a meaningful residual interest, the lessor's lack of such an interest at the end of the lease term being indicative of a security agreement. Necessarily inherent in this approach is a consideration of whether and to what extent the lessee gains equity in the property. An agreement in which the lessee gains no equity is considered consistent with a true lease. *In re Zerkle Trucking Co.,* 132 B.R. 316, 321 (Bankr.S.D.W.Va.1991).

In order to determine whether the lessor retains a meaningful residual interest, the court must consider: 1) whether the lease contains an option to purchase for no or nominal consideration, and 2) whether the lessee develops equity in the leased property such that the only sensible decision economically for the lessee is to exercise the purchase option. *Kimco Leasing v. State Board of Tax*

---

5. Because of this conclusion, the court does not need to make any findings concerning the value of the vehicles at the end of the lease term. That issue is a factor in evaluating the nominality of the additional consideration paid to exercise the option or the economic rationality/inevitability of the lessee's doing so. It is not a factor where, as here, the lessee can become the owner of the goods for no additional consideration.

*Commissioners,* 656 N.E.2d 1208, 1218 (Ind.Tax 1995).

[A]n equity in the "Lessee" is one of the distinctive characteristics of a lease intended for security.... "Whenever it can be found that a lease agreement concerning personal property contains provisions the effect of which are to create in the lessee an equity or pecuniary interest in the leased property the parties are deemed as a matter of law to have intended the lease as security...."

*Grubbs Construction,* 319 B.R. at 718 (citations and internal quotation marks omitted).

Commentators make much the same point. "If there is a meaningful reversionary interest—either an up-side right or a down-side risk—the parties have signed a lease, not a security agreement. If there is no reversionary interest, the parties have signed a security agreement, not a lease." 4 White & Summers, Uniform Commercial Code § 30–3, p. 30 (5th ed.2002).

■ Here, Volvo Financial has no meaningful reversionary interest in the vehicles. It has neither an up-side right nor a down-side risk. It has only the right to receive 20 percent of its original cost to acquire the vehicles; nothing more and nothing less. Any value in excess of that amount belongs to the debtor as does the risk—and the financial impact—that the value might fall below that figure. This state of affairs—particularly the debtor's right to receive the benefit of any value over and above the 20 percent option purchase price regardless of how the vehicles are disposed of at the end of the lease term—leads the court to conclude that the debtor had an ownership or equity interest in the property.

Relying on *In re Charles,* 278 B.R. 216, (Bankr.D.Kan.2002), Volvo Financial argues that the debtor's right to receive any value in excess of the 20 percent option

purchase price and the risk that the vehicles might be worth less than that amount is not "the badge of a disguised sale ... instead [it] provides valuable incentive to the lessee to maintain the vehicle...." *Charles,* 278 B.R. at 223. The court disagrees. Even the simplest lease can provide the necessary incentive for the lessee to properly care for and maintain the leased property by requiring the property to be returned in its original condition, reasonable wear and tear excepted, or some similar commitment. A lessee does not need to be given the up-side potential that the leased property will be worth more than expected at the end of the lease term in order to have an incentive to avoid the adverse consequences of failing to properly care for it. The argument also overlooks the fact that even if the debtor properly maintained the vehicles to the greatest extent possible, it, not Volvo Financial, bore the risk of depreciation due to factors beyond the parties' control, such as market forces or technological changes that could impact value. *See, Zerkle Trucking,* 132 B.R. at 322.

Volvo Financial points to decisions such as *Charles,* 278 B.R. 216 and *In re Beckham,* 275 B.R. 598 (D.Kan.2002) where the courts concluded that TRAC leases not unlike the one in question were true leases, not security agreements. Those decisions appear to be easily distinguishable because they each applied Kansas law and its version of the UCC has a non-uniform addition to 1–201(37) specifically addressing TRAC leases that is not found in North Carolina's version of the statute. *See, Charles,* 278 B.R. at 223; *Beckham,* 275 B.R. at 605. To the extent that is not a sufficient distinction, there are also decisions such as *Grubbs Construction,* 319 B.R. 698, and *Zerkle Trucking,* 132 B.R. 316 that have examined similar TRAC leases and have come to the conclusion

that they constitute security agreements, and the court feels that those decisions are preferable, both analytically and substantively, to *Charles* and *Beckham.*

The agreement between the debtor, Brankle Brokerage, and Volvo Financial created a security interest; it is not a true lease. Judgment will be entered accordingly.