In re DOUBLE G TRUCKING OF THE ARKLATEX, INC., Debtor.

No. 1:09–bk–73431.

United States Bankruptcy Court, W.D. Arkansas, El Dorado Division.

April 20, 2010.

Michael William Frey, Attorney at Law, Camden, AR, for Debtor.

## ORDER

JAMES G. MIXON, Bankruptcy Judge.

Before the Court is the Motion to Require Assumption or Rejection of Unexpired Lease filed by Trans Lease, Inc., which purports to be the owner and lessor of three motor vehicles leased to Double G Trucking, the Debtor-in-possession in this Chapter 11 bankruptcy. Alleging that the

Debtor has defaulted under the obligations of the lease, Trans Lease requests the Court to order the Debtor to assume or reject the lease within ten days of the entry of the Court's order.

At a hearing on the motion on October 27, 2009, the Debtor-in-possession's counsel argued that the agreement with Trans Lease was actually a disguised sale of personal property rather than a lease. If Trans Lease prevails on the issue, the Debtor-in-possession must either reject the lease and relinquish the property or assume the lease, cure any default, and perform under the lease terms in accordance with 11 U.S.C. § 365. If the Debtor-in-possession prevails, it can retain the property and propose to treat the obligation to Trans Lease as a secured debt under a plan of Chapter 11 reorganization, which is a more financially advantageous option for the Debtor-in-possession. After a trial on the merits, the Court took the matter under advisement.

This matter is a core proceeding in accordance with 28 U.S.C. § 157(b)(A)(2006), and the Court has jurisdiction to enter a final judgment in the case.

## I.

### FACTS

Most of the relevant facts in the case are not in dispute and occurred prior to the Debtor-in-possession's filing its Chapter 11 bankruptcy petition on July 13, 2009. On December 26, 2006, the Debtor-in-possession, a trucking company located in Bearden, Arkansas, and Trans Lease, a Colorado corporation, entered into an agreement styled a "Trac Motor Vehicle Master Lease" (Ex. 1) and three Terminal Rental Adjustment Clauses. (Ex. 2).

According to the Master Lease, Trans Lease, as lessor, agreed to lease to the Debtor-in-possession, the lessee, the following three vehicles: one 2004 Kenworth T2120 Tractor, serial number 1XKTDU9X34J055135, and two 2004 Kenworth T2000 Tractors, serial numbers. 1XKTDU9X84J055132 and 1XKTDU9XX4J055133. The lease required a security deposit of $1667.00, refundable at the expiration of the lease term, and a lease payment of $1589.59 for 42 months for each tractor. The capitalized cost of each vehicle was $62,365.00, and the residual value of each vehicle was listed at $9,354.75. (Ex. 1, Schedules A, B, C.) The three vehicles were used in the Debtor-in-possession's trucking operation.

Terms in the agreement include the requirement that the lease will continue until the lessee has fulfilled all obligations under the lease. The lessee is required to provide and maintain liability, collision, fire and theft insurance. (Ex. 1.)

The lease also provides that the lessee is responsible for all maintenance and assumes the risk of loss by theft or destruction and the risk of damage from any cause whether or not covered by insurance.

The lessee is in default for failure to make any required payment when due or failure to fulfill any other requirement of the lease. Upon default, the lessee is liable for liquidated damages including lease payments due at the time of default, lease payments agreed to be paid if the lease had gone to full term, and the residual value of the property.

With regard to purchasing the property at the expiration of the lease, Paragraph 16 specifically states,

> *Purchase Option.* It is understood and agreed that Lessee has *no option* to purchase the Vehicle(s) at any time; however, the Lessee may have the opportunity to purchase the Vehicle(s) upon the expiration of the Lease for an

amount equal to the Residual Value set forth in the Schedule(s).... Lessee expressly understands that Lessee shall have absolutely no equity or other ownership rights in the Vehicle(s) unless and until Lessee purchases said Vehicle(s) pursuant to this paragraph.

Exhibit 1 at 3.

The lease further provides that at the end of the lease term, the lessor will sell the property in either a private or public sale, with or without notice to the lessee, and if the amount received from the sale exceeds the residual value of the vehicle, the amount of the surplus is to be paid to the lessee. If the sale proceeds are less than the residual value, the lessee is liable for the amount of the deficiency, which in no event will be greater than the amount stated in the Terminal Rental Adjustment Clause ("TRAC").

The amount stated in the TRAC is $9354.75, or the residual value of each vehicle as set out in the schedules to the master lease. (Ex. 2.) Both the TRAC and the master lease state, "Lessee acknowledges that the potential benefit or liability contemplated by this Paragraph ... is not intended to create any equity interest in the Vehicle(s) for Lessee but rather is designed as an incentive for Lessee to properly maintain the Vehicle(s) as required by this Lease." (Ex. 1 at ¶ 17; Ex. 2 at ¶ 2.)

The master lease further provides that the lease agreement and schedules constitute the entire agreement of the parties and no waiver or modification is effective unless in writing and signed by both parties. (Ex. 1 at ¶ 19.) The lease provides that the governing law is deemed to be that of the state of Colorado, but the lessor is also entitled to litigate in any state where the lessee, the vehicles, or the lessee's assets are located. The parties agreed at the hearing to a stipulation that Arkansas law applies to this dispute. (Tr. at 28.)

On the bankruptcy schedules, the Debtor-in-possession valued two of the three vehicles at $10,000.00 each and one of the vehicles at $7500.00. (Ex. 6, Schedule D–Creditors Holding Secured Claims–Amended.) Schedule D also reflects that the Debtor-in-possession is purchasing numerous other vehicles from various other entities.

Gary Griffiths, president of the Debtor-in-possession, testified that the Debtor-in-possession has not made a rental payment to Trans Lease since March or April of 2009 and thus is in default under the lease agreement. He stated that the Debtor-in-possession continues to use two of the trucks in the trucking business, but the third one, valued at $7500.00 in the bankruptcy schedules, is in disrepair and has not been serviceable for six or eight months because the Debtor-in-possession cannot afford the cost of repairs.

Griffiths stated that the Debtor-in-possession is responsible for licensing the vehicles, which entails paying the use tax, sales tax, and licensing fee. This is the same procedure required to comply with state law with regard to the other vehicles the Debtor-in-possession purchased through financing arrangements. He also testified that the Debtor-in-possession's payments to Trans Lease are treated as a lease payment expense on the company's tax return, and the vehicles are not depreciated for income tax purposes.

The Debtor-in-possession introduced portions of a 2009 NADA pamphlet highlighting the particular model, year and make of the tractors at issue. (Ex. 7.) However, no testimony was offered as to mileage and other particulars pertaining to each vehicle that would be relevant in using the NADA to estimate values. After

identifying the 2009 NADA pages as Exhibit 7, Griffiths testified that the tractors have value of approximately $10,000.00 each. (Tr. at 21.)

Griffiths' testified that his understanding from discussions with a Trans Lease representative was that he would have an option to purchase the vehicles at the end of the lease term for the stated residual value. However, he conceded this understanding was contradicted by the written contract. This testimony concerning an oral promise of option to purchase was objected to on the basis that it was inadmissible parol evidence. The Court will first address the parol evidence issue before determining whether the transaction was a lease or a sale.

## II.

### LAW AND REASONING

■ Under bankruptcy law, the burden of proof is on the party seeking to characterize a purported lease agreement as a disguised security agreement. *Duke Energy Royal, LLC v. Pillowtex Corp. (In re Pillowtex, Inc.)*, 349 F.3d 711, (3d Cir. 2003); *WorldCom, Inc. v. Gen. Electric Global Asset Management Servs. (In re WorldCom, Inc.)*, 339 B.R. 56, 62 (Bankr. S.D.N.Y.2006) (quoting *In re Owen*, 221 B.R. 56, 60 (Bankr.N.D.N.Y.1998) and *In re QDS Components, Inc.*, 292 B.R. 313, 321–322 (Bankr.S.D.Ohio 2002)) (quoting *In re Murray*, 191 B.R. 309, 316 (Bankr. E.D.Pa.1996)); *In re Triplex Marine Maint., Inc.*, 258 B.R. 659, 664 (Bankr. E.D.Tex.2000); *In re Edison Bros. Stores, Inc.*, 207 B.R. 801, 812 (Bankr.D.Del.1997); *In re Zaleha*, 159 B.R. 581, 586 (Bankr.D.Idaho 1993). Thus, the Debtor-in-possession bears the burden of proof.

■ State law controls the issues before the Court. *Speck v. First Nat'l Bank (In re Speck)*, 798 F.2d 279, 280 (8th Cir.1986);

*In re Architectural Millwork of Virginia, Inc.*, 226 B.R. 551, 553 (Bankr.W.D.Va. 1998) (citing *In re Yarbrough*, 211 B.R. 654, 656 (Bankr.W.D.Tenn.1997); *In re Nat'l Traveler*, 110 B.R. 619, 620 (Bankr. M.D.Ga.1990)). Accordingly, the Court will rely on Arkansas law to decide the issue of whether parol evidence will be considered to support the Debtor-in-possession's contention that Griffiths and Trans Lease agreed in pre-lease negotiations that the Debtor-in-possession would have an option to purchase the tractors at the end of the lease term.

### A. Whether Parol Evidence of Option to Purchase Will be Considered

■ In contract law, the word "option" is generally understood to mean "an offer by one party to sell within a limited period of time and a right acquired by the other party to accept or reject such offer within such time." *Heartland Community Bank v. Holt*, 68 Ark.App. 30, 36, 3 S.W.3d 694, 698 (1999) (citing *Swift v. Erwin*, 104 Ark. 459, 148 S.W. 267 (1912)).

■■ The parol evidence rule is a substantive rule of contract law that excludes "prior or contemporaneous agreements of the parties that would vary the express terms of their written agreement." *Vogelgesang v. U.S. Bank*, 92 Ark.App. 116, 121, 211 S.W.3d 575, 578–79 (2005) (citing *First Nat'l Bank v. Griffin*, 310 Ark. 164, 832 S.W.2d 816 (1992)).

With these two principles as a basis, the Court next turns to the Arkansas version of the Uniform Commercial Code, upon which both parties rely to support their respective positions with regard to the issue of whether the transaction is a lease or sale. The two applicable statutes on parol evidence pertaining to written leases and sales contracts are nearly identical and instruct when and if extrinsic evidence is admissible in the commercial context:

Final written expression—Parol or extrinsic evidence.

Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:

(a) by course of performance, course of dealing, or usage of trade; or

(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

Ark.Code Ann. § 4–2–202 (Michie Supp. 2005)(Ark. Code Ann. § 4–2A–202 substantially similar).

In the instant case, the master lease contains a merger clause providing that the lease agreement and schedules constitute the entire agreement of the parties and that any waiver or modification of terms must be in writing. (Ex. 1.) Further, the master lease expressly states that "Lessee has no **option** to purchase the Vehicle(s) at any time; however, the Lessee **may** have the **opportunity** to purchase the Vehicle(s) upon the expiration of the lease...." (Ex. 1, emphasis added.)

■ The statute is clear that terms set forth in a writing containing a merger clause showing an intent to be a final expression of the agreement may not be contradicted by a prior agreement or contemporaneous oral agreement. But the writing may be supplemented or explained by course of performance, course of dealing, or usage of trade, as defined in section 4–1–303 of the Arkansas Code Annotated, and by evidence of consistent additional terms. Thus, a merger clause is not a bar

to all extrinsic evidence under section 4–2–202. *Bank of America v. C.D. Smith Motor Co.*, 353 Ark. 228, 238, 106 S.W.3d 425, 429 (2003).

In *Bank of America*, the court quoted a well-known treatise on the Uniform Commercial Code to elaborate on when extrinsic evidence may be considered:

A court may decide that the writing is not a "final written expression" as to any terms and admit the evidence. A court may decide that the writing is a final written expression of some terms, but not a "complete and exclusive" statement of all terms, and admit evidence of "consistent additional terms." A court may decide that the writing is a final written expression as to terms and also that the writing is a "complete and exclusive statement," yet admit evidence of course of dealing, usage of trade, or course of performance to "explain" the meaning of terms in the writing.

*Bank of America*, 353 Ark. at 245, 106 S.W.3d at 435 (quoting 1 James J. White & Robert S. Summers, Uniform Commercial Code, § 2–12 (4th ed.1995)).

■ In examining the merger clause at issue, the Court rules that it unambiguously expresses an intent that the writing function as a final written expression of the parties' agreement. Such merger clauses are valid. *General Aviation, Inc. v. Cessna Aircraft Co.*, 915 F.2d 1038, 1041 (6th Cir.1990) (giving effect to merger clause that asserted the agreement was the final written expression of the parties). Therefore, the only extrinsic evidence the Court could consider on the issue of an option to purchase would be for the purpose of explaining a contract term.

■ However, the extrinsic evidence the Debtor wishes to offer—that he was promised an option to purchase—directly con-

tradicts the first clause of the contract term dealing with options: "It is understood and agreed that Lessee has no option to purchase the Vehicle(s) at any time." (Ex. 1) Under the parol evidence rule, a party may introduce course of dealing, course of performance, and usage of trade[1] to supplement or explain, but not to contradict an express term. *General Plumbing & Heating, Inc. v. American Air Filter Co., Inc.,* 696 F.2d 375, 378 (5th Cir.1983).

■ The term of the contract dealing with options to purchase also provides, in the second clause of the sentence, that the lessee may have the opportunity to purchase. However, the Court cannot read into this language the existence of a legally-binding offer by Trans Lease to sell and a corresponding right of the Debtor-in-possession to purchase the leased property at the end of the lease term. The term provides for the possibility of an opportunity to purchase at Trans Lease's discretion, and nothing more. The Debtor-in-possession introduced no signed, written waiver or modification varying this term; therefore, the term stands as recited in the master lease.

That being said, the Court will not consider the contradictory extrinsic evidence of any prior or contemporaneous agreement between the parties that the Debtor would be allowed to exercise an option to purchase the leased tractors at the end of the lease term.

### B. Whether the Agreement is a Security Interest as a Matter of Law

Next, the Court looks to the substance of the agreement between the parties to determine whether the transaction is a lease or a sale. The applicable statute sets up an analytic framework for distinguishing between the two:

**4–1–203. Lease distinguished from security interest.**

(a) Whether a transaction in the form of a lease creates a lease or security interest is determined by the facts of each case.

(b) A transaction in the form of a lease creates a security interest if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee, and:

(1) the original term of the lease is equal to or greater than the remaining economic life of the goods;

(2) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;

(3) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement; or

(4) the lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement.

(c) A transaction in the form of a lease does not create a security interest merely because:

(1) the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into;

---

**1.** The Court makes no finding with regard to whether the Debtor's extrinsic evidence of an

option to purchase falls within any of these three categories.

(2) the lessee assumes risk of loss of the goods;

(3) the lessee agrees to pay, with respect to the goods, taxes, insurance, filing, recording, or registration fees, or service or maintenance costs;

(4) the lessee has an option to renew the lease or to become the owner of the goods;

(5) the lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed; or

(6) the lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

(d) Additional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised. Additional consideration is not nominal if:

(1) when the option to renew the lease is granted to the lessee, the rent is stated to be the fair market rent for the use of the goods for the term of the renewal determined at the time the option is to be performed; or

(2) when the option to become the owner of the goods is granted to the lessee, the price is stated to be the fair market value of the goods, determined at the time the option is to be performed.

(e) The "remaining economic life of the goods" and "reasonably predictable" fair market rent, fair market value, or cost of performing under the lease agreement must be determined with reference to the facts and circumstances at the time the transaction is entered into.

Ark.Code Ann. § 4-1-203(a)-(e) (Michie Supp.2005).[2]

Subsection (a) of the statute requires the Court to examine the particular facts of each case in resolving whether the agreement between the parties is a lease or a security interest. Subsection (b) sets out certain conditions, which, if met, characterizes a security interest as a matter of law. *In re Copeland*, 238 B.R. 801, 803–804 (Bankr.E.D.Ark.1999) (citing Ark.Code Ann. § 4-1-201(37)(a) (Michie Supp.1997); *In re All Am. Mfg. Corp. v. Quality Textile Screen Prints, Inc. (In re All Am. Mfg. Corp.)*, 172 B.R. 394, 397 (Bankr. S.D.Fla.1994); *Addison v. Burnett*, 41 Cal. App.4th 1288, 49 Cal.Rptr.2d 132, 135 (1996)).

Subsection (b) provides that a transaction in the form of a lease creates a security interest if the lessee is obliged to pay throughout the entire lease term without possibility of early termination and if at least one of four other enumerated conditions applies. In the instant case, the contract expressly forbids early termination and enforces the term with a stringent liquidated damages provision in the event of default. Moreover, Trans Lease concedes that the master lease requires the Debtor-in-possession to complete the obligations under the lease term without the possibility of early termination. Thus, the first part of Subsection (b) is satisfied. (Trans Lease Trial Brief at 3.)

The Debtor-in-possession concedes that the first three conditions described in (b)(1), (2), and (3) are not met, but argues that the transaction does provide for an

**2.** Section 4-1-203 was formerly numbered Section 4-1-201(37), which was adopted in 1993.

option to purchase the tractors at the end of the lease term for nominal consideration so that (b)(4) is satisfied and the transaction is, therefore, a security interest as a matter of law. (Trial Brief of Double G Trucking of the Arklatex, Inc. at 3.) Trans Lease disputes that the transaction included an option to purchase and further argues that, even if the Debtor-in-possession were allowed to purchase the tractors, the purchase price would have exceeded nominal consideration.

Thus, the issue under subsection (b)(4) is whether the Debtor-in-possession had the option to purchase the tractors for no additional consideration or for nominal consideration. Under the definition of "option," Trans Lease must have been required to offer the vehicles to the Debtor-in-possession at the end of the lease term, and the Debtor-in-possession must have been entitled to accept or reject the offer.

As previously stated, the agreement between the parties specifically denied the Debtor-in-possession any option to purchase and further recited that Trans Lease might sell the vehicles to the Debtor-in-possession, but might also conduct a public or private sale with or without notice to the Debtor-in-possession. Under the express terms of the agreement, Trans Lease has obligated itself to sell the vehicles at the end of the lease term, but to whom Trans Lease will sell is left to its sole discretion.

The Debtor-in-possession argues that, despite the express denial of an option to purchase, the language in other provisions of the agreement reinforce the argument that an option to purchase existed none-theless. The Debtor-in-possession points out that the term denying an option to purchase was introduced by the heading, "PURCHASE OPTION," not "NO PURCHASE OPTION." Additionally, Schedule "A" does not reiterate the denial of a purchase option, and the extension agreements call for 26 payments and a "residual payment." (Exs.1, 3.)

The Court finds that the heading "Purchase Option" is not misleading, given that the language immediately following the heading states clearly, "It is understood and agreed that Lessee has no option to purchase the vehicles at any time ..." (Ex. 1.) As to Schedules A, B, and C, the first sentence provides that the schedule is executed pursuant to the terms of the master lease signed and dated the same day. The purpose of the schedules is to itemize cost, lease payment, residual value, fees, and the lease term of each individual vehicle leased, not to reiterate unnecessarily every provision stated in the contemporaneously-executed master lease. The extension agreements do refer to the residual value as a "residual payment," but characterizing it as such is consistent with the parties' agreement that Trans Lease is assured of receiving a residual payment from someone, either from the Debtor-in-possession or from a third party or from a combination of the two. Referring to a "residual payment" is insufficient to negate the master lease term plainly denying an option to purchase.

For the foregoing reasons, the Debtor-in-possession has failed to prove that the agreement included an option to purchase for nominal consideration.[3] Therefore, the

---

**3.** But see *In re Architectural Millwork*, 226 B.R. at 554. In this case, the court examined an agreement that did not expressly provide for an option to purchase, but the court found an option to purchase nevertheless existed by virtue of testimony offered, perhaps unintentionally, by the lessor and a provision in the lease similar to the TRAC in the instant case. However, the purchase price was for more than nominal value, and the court ruled the transaction was a lease despite the implied option to purchase.

Court declines to find that, as a matter of law, the parties' transaction is a secured sale.

### C. Whether the Totality of Circumstances Support a Finding of a Security Interest

Under the statute, the Court must also address a second inquiry: Whether, considering all the facts and circumstances of this case and not just those indicated by 1–203(b), the transaction was a lease or sale.

In examining the facts and circumstances of this case, the Court is mindful of the six factors listed in Section 4–1–203(c), cited above. Under the express wording of the statute, each of these factors is "not enough alone to make the transaction one for security and more likely render[s] the transaction a lease." 4 James J. White & Robert S. Summers, Uniform Commercial Code, § 30–3 (6th ed.2002).

At the outset of this analysis, the Court observes that Subsections (4), (5), and (6) of Section (c) are not applicable in this case because they deal with options to purchase or renew a lease, and the Court has found no such option exists. However, Subsections (1), (2), and (3) are terms evident in the current lease.

Subsection (c)(1) describes a "full payout lease," a type of lease where "the lessee pays an amount equal to or greater than the lessor's cost of the goods or their fair market value." *Carlson v. Giacchetti*, 35 Mass.App.Ct. 57, 616 N.E.2d 810, 812 (1993) (citing *In re Brookside Drug Store, Inc.*, 3 B.R. 120 (Bankr.D.Conn.1980)). Such a circumstance exists here, where Trans Lease's "capitalized cost" for each vehicle was $62,365.00, an amount exceeded by the $66,762.78 to $76,117.53 [4] in total

rental payments that will be required to be paid for each vehicle under the master lease. (Ex. 1, Schedules A, B, & C.)

Subsections (c)(2) and (3) refer to attributes of a "net lease," a type of lease in which "the lessee assumes all risk of loss and pays all taxes, insurance, maintenance, and the like." Id. In the instant case, the agreement between the parties obligates the Debtor-in-possession to provide insurance, maintain the vehicles, and bear the risk of loss. The Debtor-in-possession is responsible for licensing the vehicles and also for paying the use tax, sales tax, and licensing fee. Hence, the transaction before the Court is a net lease, as well as a full payout lease. On the other hand, Trans Lease has title to the tractors and is entitled to claim depreciation for income tax purposes, while the Debtor-in-possession's lease payments are "written off as lease payments." (Tr. at 25.)

The statute provides that proof of any one of these factors is insufficient to prove the transaction is a sale. Moreover, courts have found that even a combination of the factors listed in Subsection (c) does not conclusively prove that the agreement is a sale instead of a lease. *See In re Architectural Millwork*, 226 B.R. at 556 (stating it is reasonable for a lessee to agree to undertake maintenance, risks of loss or damage, and payment of taxes while in possession and use of the property)(quoting *Basic Leasing v. Paccar Inc.*, 1991 WL 117412 (D.N.J.)); *Carlson*, 616 N.E.2d at 814 (recognizing contract terms favoring the lessor often reflect "the relative bargaining positions of the parties, the value of the credit provided by a lease, and the uniqueness of the equipment; consequently, they are as likely to appear in a 'true lease' as they are in a secured trans-

---

4. Monthly rental payments of $1589.59 × 42 months = $66,762.78. If the Debtor-in-possession pays the maximum terminal rental adjustment payment of $9,354.75, the total amount paid will be $76,117.53.

action"). *See also In re Murray,* 191 B.R. 309, 316 (Bankr.E.D.Pa.1996)(stating that responsibility for usual semblances of ownership is typical of net lease and not dispositive of the lease-or-sale issue), *aff'd,* 201 B.R. 381 (E.D.Pa.1996); *In re Lerch,* 147 B.R. 455, 461 (Bankr.C.D.Ill.1992) (recognizing that taxes, insurance and repairs must be borne by one party or the other and that "the lessor is either going to include those costs within the rental charge or agree to a lower rent if the lessee takes responsibility") (quoting *In re Marhoefer Packing Co.,* 674 F.2d 1139, 1146 (7th Cir.1982)(quoting *Rainier Nat'l Bank v. Inland Machinery Co.,* 29 Wash. App. 725, 631 P.2d 389 (1981))); *In re P.W.L. Invs.,* 92 B.R. 680, 682 (Bankr.W.D.Texas 1987) (observing that "If merely making a profit by charging lease payments in excess of . . . initial cost . . . makes a lease a security agreement, then every lease would be a security agreement . . ."); *In re Odell,* 27 B.R. 520, 520 (Bankr.D.Or.1983)(stating such indicia of sale are not necessarily inappropriate in a true lease).

In this case, the Court concurs with these courts that these "indicia" of a disguised sale are not particularly persuasive on the issue of whether the transaction is a lease or sale. It is reasonable that the Debtor-in-possession, the party controlling the manner of use of the tractors, maintain the property and pay the taxes and fees necessary for compliance with licensing requirements that the Debtor-in-possession must meet to operate legitimately. Furthermore, the fact that the total rental payments exceed capitalized cost could as easily reflect the rental profit as interest pursuant to a financing arrangement. *But see In re Pillowtex,* 349 F.3d at 719–20 (following the rationale that if lessee must pay full purchase price plus interest charge over lease term, a sale is likely to

have been intended) (quoting *Edison Bros. Stores, Inc.,* 207 B.R. at 814.)

### D. *Whether the Lessor Retained a Reversionary Interest in the Goods*

 In examining the particular facts and circumstances pursuant to the statute, the key question is whether the economic realities of the transaction lead to the conclusion that the agreement is a disguised sale. *Brankle Brokerage & Leasing, Inc. v. Volvo Fin. Servs. (In re Brankle Brokerage & Leasing, Inc.),* 394 B.R. 906, 913 (Bankr.N.D.Ind.2008). The Court is required "to consider the overall import of the entire transaction, rather than particular bits and pieces of it." *Id.*

 In examining the economic realities of the particular transaction, the focus of the analysis is on whether the lessor has retained a meaningful residual interest in the goods at the end of the lease term; if not, then there is no residual value in the lessor, as would be expected under a true lease. Therefore, the transaction is more than likely a sale, not a lease. *In re Copeland,* 238 B.R. at 804 (citing *In re Allen,* 174 B.R. 293, 295 (Bankr.D.Or. 1994); In re *Zaleha,* 159 B.R. 581, 585 (Bankr.Idaho 1993)) (quoting *Woodson v. Ford Motor Cred. Co. (In re Cole),* 100 B.R. 561, 564 (Bankr.N.D.Okla., 1989)); *Addison v. Burnett,* 41 Cal.App.4th 1288, 49 Cal.Rptr.2d 132, 136 (1996); *Kimco Leasing, Inc. v. State Board of Tax Commissioners,* 656 N.E.2d 1208 n. 14 (Ind. Tax Ct.1995) (citing *In re Zaleha,* 159 B.R. at 584); (4 White & Summers, Uniform Commercial Code, § 30–3 at 24–25).

 The question of whether the lessor retained a meaningful residual interest may be determined by examining the specific circumstances surrounding two elements: an option to purchase for nominal or no consideration and any provision for the lessee's acquisition of equity in the

goods. *Addison v. Burnett*, 41 Cal. App.4th 1288, 49 Cal.Rptr.2d 132 (1996)(quoting *In re Zaleha*, 159 B.R. 581, 585 (Bankr.D.Idaho 1993) and citing *In re Bumgardner*, 183 B.R. 224, 228 (Bankr.D.Idaho 1995)). In the instant case, the contract specifically denies the Debtor-in-possession an option to purchase. Thus, only the second element is implicated. The fact that a lessee has acquired an equity in the property is important in proving a disguised sale because it "suggests the lessor did not expect the return of the leased goods." *In re Zaleha*, 159 B.R. at 585.

### E. Whether the TRAC Created an Equity Interest in the Debtor-in-possession

■ Accordingly, whether the Debtor-in-possession has acquired an equity in the property depends on the effect of the lease's TRAC, which determines whether any residual interest is retained by the lessor at the end of the lease term. Each schedule to the master lease provides for a specific residual value of $9,354.75 per vehicle, and the TRAC provides that Trans Lease will sell the vehicle at the end of the lease term, with or without notice to the Debtor. If the sale price received is less than the residual value, the Debtor-in-possession is liable for the deficiency. If the sale exceeds the residual value, the surplus will be paid to the Debtor-in-possession.

Courts have described leases with TRAC provisions as "open-ended" because the relationship between the lessor and lessee does not end at the completion of the lease term. *Adelman v. General Motors Acceptance Corp. (In re Tulsa Port Warehouse Co.)*, 690 F.2d 809, 811 n. 1 (10th Cir.1982), *partially superseded by statute as stated in, In re Charles*, 278 B.R. 216 (Bankr.D.Kan.2002).

A split of authority exists on the issue of whether such open-ended TRAC leases leave a reversionary interest in the lessor or whether the transaction between the parties creates equity in the lessee so that the transaction is, in fact, a security interest. However, typically, courts hold that such a provision supports the finding of the existence of a security interest. *See In re Tulsa Port Warehouse Co.*, 690 F.2d at 811 (stating the transaction recognized equity in the lessee who bore the loss or gain from the disposition of the property at the end of the lease term) (quoting *Bill Swad Leasing Co. v. Stikes (In re Tillery)*, 571 F.2d 1361, 1365 (5th Cir.1978)); *In re Grubbs Construc. Co.*, 319 B.R. 698, 724 (Bankr.M.D.Fla.2005)(finding that TRAC lease was financing transaction where debtor was responsible for principal and predetermined interest and would receive credit or pay deficiency in the collateral); *In re Zerkle Trucking Co.*, 132 B.R. 316, 322 (Bankr.S.D.W.Va.1991) (ruling that TRAC lease allocated to the lessee all the entrepreneurial risk to equity); *In re McNutt*, 37 B.R. 95, 96 (Bankr.D.Or.1984)(finding termination formula providing lessee with loss or gain on the disposition of the vehicle recognizes lessee's equity in the vehicle).

For cases finding under similar circumstances that the transaction was a lease, see *Wheels, Inc. v. Otasco, Inc. (In re Otasco, Inc.)*, 196 B.R. 554, 559–60 (N.D.Okla.1991) (finding that termination clause did not create equity interest in lessee but was a means for lessor to protect against abuse of its vehicle during lease term); *Sharer v. Creative Leasing, Inc.*, 612 So.2d 1191, 1195 (Ala.1993)(holding that termination clause does not create equity in lessee but shifts risk that actual value of the leased vehicle at termination will be different from the predicted book value or depreciated value).

In line with the minority view that the TRAC lease is a true lease, the typical TRAC provision has been described as, "a more sophisticated means to measure the true extent to which the lessee has consumed the lessor's interest in the goods.... A [TRAC] that requires the lessor to sell the goods after termination of the lease does not change the economic reality of the transaction. It simply establishes mandatory sale as the exclusive method to fix the value of the residual actually returned by the lessee." John Hart Minan & William H. Lawrence, The Law of Personal Property Leasing, § 2:26 (May 2009).

In determining whether Trans Lease has a reversionary interest, the Court is guided by the Arkansas statute specifically providing that as to commercial vehicles, TRACs do not give rise to a sale or security interest:

4–2A–110. Terminal rental adjustment clauses for vehicle leases

_____ Not sales or security interests

In the case of motor vehicles and trailers, notwithstanding any other provision of law, a leasing agreement involving a motor vehicle or trailer shall not create a sales transaction or a security interest in the vehicle merely because the lease contains provisions which provide that the rental price is permitted or required to be adjusted under the agreement either upward or downward based upon an amount which may be realized from a sale or other disposition of the vehicle after the end or termination of the lease period.

Ark.Code Ann. § 4–2A–110 (Michie 2001).

This provision is a non-Uniform Commercial Code section that resulted from companion legislation accompanying Article 2A of the Uniform Commercial Code section. Similar or identical provisions have been enacted by a majority of states adopting Article 2A, apparently at the urging of the vehicle leasing industry. Robert D. Strauss, Practising Law Institute, "Equipment Leasing–Leveraged Leasing" § 3:1.4 (December 2008). Although critical of the statute as an "aberration," this commentator recognizes that the statute's legal effect "might" be to bind bankruptcy courts to characterize a TRAC lease as a true lease. *Id.*

Courts in jurisdictions with a TRAC statute similar to that in Arkansas have recognized that the law discourages or prohibits characterizing a transaction dealing with motor vehicles and trailers as a sale or security interest on the basis that the transaction includes a TRAC provision. *See Morris v. Dealers Leasing, Inc. (In re Beckham),* 275 B.R. 598, 605 (D.Kan.2002)(stating that Kansas statute on TRAC leases undermines the argument that a TRAC lessor has no entrepreneurial stake but stands in the shoes of a traditional lender), *aff'd.,* 52 Fed.Appx. 119 (10th Cir.2002); *Morris v. U.S. Bancorp Leasing & Fin. (In re Charles),* 278 B.R. 216, 223 (Bankr.D.Kan.2002) (finding that Kansas statute similar to Arkansas statute hobbles the argument that TRAC leases of vehicles and trailers are by definition sales or secured transactions); *In re Owen,* 221 B.R. 56, 64 (Bankr.N.D.N.Y.1998)(recognizing that New York statute similar to Arkansas statute creates presumption that lease containing TRAC is a true lease). *But see In re Architectural Millwork,* 226 B.R. at 557 (interpreting similar Virginia statute as not dispositive but nevertheless finding the particular transaction was a lease because no equity was expected to accrue and option price was not nominal); *Brankle Brokerage & Leasing, Inc. v. Volvo Fin. Servs (In re Brankle),* 394 B.R. 906, 909–10 (Bankr.N.D.Ind.2008) (considering North Carolina TRAC-lease law dis-

tinguishable from that in Arkansas and finding it was not dispositive on the issue of whether the transaction created a security interest).

In the instant case, the vehicle lease provides for the rental price to be adjusted based on the amount which may be realized from the disposition of the vehicle at the termination of the lease. Thus, the lease comes within the ambit of the statute, which dictates that the Debtor-in-possession may not rely on the TRAC provision to prove it has equity in the tractors. Without proof of the Debtor-in-possession's equity or other support for a finding that Trans Lease did not retain a reversionary interest or entrepreneurial stake, the Court is compelled to rule that the Debtor-in-possession has not carried its burden on this element.

### CONCLUSION

The Debtor-in-possession failed to prove that the transaction was a security interest as a matter of law because the transaction did not grant an option to purchase. Furthermore, weighing all the relevant facts and circumstances to determine the character of the parties' agreement, the Court concludes that the transaction is a true lease. Therefore, Trans Lease's Motion to Require Assumption or Rejection of Unexpired Lease is granted. The Debtor-in-possession has ten days from the entry of this order to assume or reject the lease.

IT IS SO ORDERED.